2013 OK CIV APP 101

**FIRST BANK AND TRUST,**
Plaintiff/Appellee,

v.

Louis MAYNAHONAH, Marquita Caratinni, and Karen Heminokeky, in their official capacities as members [1] of the Business Committee of the Apache Tribe of Oklahoma, Defendants/Appellants,

and

Alonzo Chalepah, Mary Prentiss, Beverly Mattice, Gloria Redbird, Apache Jim Wetselline, in their official capacities as putative members of the Business Committee of the Apache Tribe of Oklahoma, Defendants,

and

Gloria Redbird, Richard Banderas, Defendants,

and

Kirk Garton, Brian Bush, Sam Caruso, Ethan Harper, Leah Fowler, Leah Adams, and Glenda Douglas, in their official capacity as members of the Gaming Board of Directors of the Apache Tribe of Oklahoma, Defendants.

No. 109,336.

Court of Civil Appeals of Oklahoma, Division No. 2.

Oct. 14, 2013.

---

1. Plaintiff/Appellee correctly notes this caption filed by Defendants/Appellants in their Petition in Error is different from the caption of the case in the trial court's Order that is the subject of this appeal. The Petition in Error has omitted the word "putative" in front of the words "members of the Business Committee of the Apache Tribe of Oklahoma" and "members of the Gaming Board of Directors of the Apache Tribe of Oklahoma" in contravention of Oklahoma Supreme Court Rule 1.25(h), 12 O.S.2011, ch. 15, app. 1. However, the caption change does not affect this Court's decision and, unless otherwise directed by the Oklahoma Supreme Court, will remain the caption in this appeal.

Leslie L. Lynch, Ellen A. Adams, Gable-gotwals, Oklahoma City, Oklahoma, for Plaintiff/Appellee.

Jon E. Brightmire, David McCullough, Bryan J. Nowlin, Doerner, Saunders, Daniel & Anderson, L.L.P., Tulsa, Oklahoma, for Defendants/Appellants.

DEBORAH B. BARNES, Vice–Chief Judge.

¶ 1 Defendants/Appellants Louis Maynahonah, Marquita Caratinni, and Karen Heminokeky in their official capacities as members of the Business Committee of the Apache Tribe of Oklahoma (the Maynahonah Group) appeal from an Order of the district court awarding attorney fees and costs to Plaintiff/Appellee First Bank and Trust (First Bank).[2] The dispositive issue on appeal is whether the Apache Tribe of Oklahoma (the Tribe) waived sovereign immunity in this interpleader action. Based on the law and the facts presented in the record on appeal, we conclude sovereign immunity applies to inter-pleader actions and the Tribe did not waive its immunity; consequently, we reverse the Order awarding attorney fees and costs against the interpleaded funds.

## BACKGROUND

¶ 2 In its Petition for Interpleader, First Bank alleged that on May 21, 2010, "it was requested" to "open various accounts on behalf of the Apache Tribe of Oklahoma" (the Tribe) "and its related entities...."[3] First Bank "began the process of opening the various accounts and allowed deposits and certain withdrawals to be made," although it was still anticipating receipt of "fully executed signature cards and the 'Resolution of Lodge, Association or Other Similar Organization' ('Resolution') required by First Bank for each account...." The various accounts—thirty-six of which were opened in the Tribe's name (the tribe funds) and six of which were opened in the name of Silver Buffalo Casino (the casino funds)—were denominated "Apache Tribe Accounts" (Tribe Accounts) in the petition and the monies deposited were collectively referenced as the "Funds" (the Funds). The Funds totaled $488,813.86.

¶ 3 First Bank claimed that "[s]hortly after the process to open the [Tribe Accounts] was begun," it began receiving competing demands from the Defendant groups, each group claiming it was "entitled to withdraw, access or control the Funds in one or more [Tribe Accounts]." Claims between Chalepah Group and the Maynahonah Group—each of which claimed to be the properly constituted and authorized Business Committee of the Tribe [4]—were made to the tribe

---

2. The interpleader also named as defendants: Alonzo Chalepah, Mary Prentiss, Beverly Mattice, Gloria Redbird, and Apache Jim Wetselline, in their official capacity as putative members of the Business Committee of the Apache Tribe of Oklahoma (Chalepah Group); Gloria Redbird, and Richard Banderas; and Kirk Garton, Brian Bush, Sam Caruso, Ethan Harper, Leah Fowler, Leah Adams, and Glenda Douglas, in their official capacity as members of the Gaming Board of Directors of the Apache Tribe of Oklahoma (Garton Group). The Order stated Chalepah Group was served "with the Petition for Interpleader on July 2, 2010, [but] did not appear and are in default." *See also* R. at 25–47.

3. R. at 2.

4. Article V of the Apache Constitution describes the composition and term of office of the members of the Business Committee. R. at 123. It also sets out the powers of the Business Committee as follows:

> [The Business Committee] shall [h]ave such powers as may be delegated to it by appropriate resolutions of the tribal council, and, within such delegated authority, may transact business and otherwise speak or act on behalf of the [T]ribe in all matters on which the [T]ribe is empowered to act now or in the future.

funds, and claims between the Maynahonah Group and Garton Group were made to the casino funds. Further, First Bank alleged that as a result of the competing claims, Chalepah Group and the Maynahonah Group agreed "that the Funds would be held until ... the competing claims were resolved and the membership of the properly constituted Business Committee was determined."[5] It alleged that since the time of that agreement, however, "the claims of the competing groups have escalated and threats of litigation against First Bank ... have been made," and the competing groups do not appear able themselves to reach a resolution. First Bank also alleged that, upon inquiry, it had been informed that the only entity or person to whom it could release the Funds was the Business Committee.[6]

¶ 4 First Bank claimed it was entitled to interpleader because if it were to comply with the request of any of the groups, it would be exposed to double or multiple liability because of the inconsistent claims made to the Funds.[7] It also disclaimed any inter-

---

Article III of the Apache Constitution also states the Tribal Council is "[t]he supreme governing body of the" Tribe. R. at 123. Article VI sets out the requirements for and purposes of an annual meeting of the Tribal Council and for the calling of special meetings of the tribal council. R. at 123–24.

Chalepah Group is comprised of the members of the former Business Committee; the Maynahonah Group is comprised of those who claimed to have been duly elected at the March 20, 2010 election. The contest between these two groups concerned, in part, a challenge by the Tribe's Election Board (the Board) to the March 20 election. R. at 190. The Board filed a protest with the regional office of the Bureau of Indian Affairs (BIA) because it believed the election was tainted. On May 19, 2010, the BIA made an interim decision that the Board had no authority under the Tribe's election ordinance to protest an election; it only had authority, after an election, to decide protests for a recount and no such protest for recount was made. Further, in a letter dated May 19, 2010, the BIA recognized, on an interim basis, "Louis Maynahonah (the putative winner of the March 20, 2010 election) as the Chairman of the [Tribe]." R. at 158. In a letter dated May 25, 2010, the BIA clarified its intent to recognize all of the members of the Maynahonah Group as composing the Business Committee. R. at 160. Citing concerns about the ability of the Tribe to provide essential services to its members and to avoid disruption of those services as well as uninterrupted operation of its economic enterprises, on June 8, 2010, the BIA made its May 19 decision "effective immediately." R. at 161.

Meanwhile, on May 20, 2010, Chalepah Group held a meeting of the Business Committee at which it voted to adopt a resolution dated May 14, 2010, to open bank accounts for the Tribe with First Bank and to grant banking privileges to certain individuals, themselves. R. at 162–63, 164. It is unclear from First Bank's petition when the Funds were actually deposited with it, but the contest between Chalepah Group and the Maynahonah Group concerned which group had tribal authority over the Funds.

On June 1, 2010, the Board filed an appeal of the May 19 BIA decision disavowing the Board's authority to protest the election to the Interior Board of Indian Appeals. R. at 190. On June 16, 2010, the Office of the Secretary of the Department of the Interior assumed jurisdiction over the appeal. On June 19, the Tribal Council, "the Supreme Governing Body of the [Tribe]," determined at its annual meeting that the Maynahonah Group was the numerical winner of the election. R. at 185, 190. In an interlocutory order issued by the Assistant Secretary–Indian Affairs of the Department of Interior on June 25, the Regional Director of the BIA was instructed to determine whether the June 19, 2010 tribal council meeting was valid and whether the vote to ratify the election results was a valid act of the Tribal Council. The decision of the Regional Director was that while the Tribal Council meeting "may not have conformed perfectly to the Tribe's Constitution, it presented the membership the opportunity to address the issue of the validity of the March 20, 2010 election a second time" and, with a majority present, tribal members were able to conduct business pursuant to the Tribe's Constitution. R. at 192. Based on the Tribal Council's actions, the Regional Director also recognized the Maynahonah Group as the duly elected members of the Business Committee until the next election in 2012.

**5.** R. at 3.

**6.** First Bank also alleged Defendant Gloria Redbird was a member of Chalepah Group and the Maynahonah Group, but she would not or could not accept the Funds on behalf of the Business Committee. R. at 4.

**7.** First Bank and the Maynahonah Group appear to agree on many of the facts surrounding how the Funds came to be deposited with First Bank and the post-election events concerning the Business Committee. Moreover, First Bank asserts that it had no knowledge that Chalepah Group back-dated its resolution authorizing it to deposit the Funds with First Bank. R. at 200, n.2. They disagree, however, on the meaning and import of those facts as to First Bank's claim that it needed to file the interpleader.

The position of the Maynahonah Group is that prior to the date the interpleader action was

est in the Funds—it was not a stakeholder—and requested that the Funds be directly deposited with the trial court or the court's designee, and that it be "discharge[d] ... from this action and from liability as to the claims of the Defendants or any other person with respect to the Funds."[8] It also requested attorney fees and costs from the "interpled Funds."

¶ 5 First Bank filed the petition on June 30, 2010, and the trial court issued its Order of Interpleader on the same day.[9] Reiterating the factual allegations set forth in First Bank's petition, the court made the following orders:

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that [First Bank] shall immediately pay the $488,813.86 to the Clerk of this Court ... to be held by the Clerk of this Court until further order of this Court.
>
> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Defendants constituting the Chalepah Group, the Maynahonah Group and the Garton Group shall interplead and settle among themselves their rights to these funds.

IT IS FURTHER ORDERED that on the 8th day of September, 2010 ... defendants shall appear and show cause why [First Bank] should not be discharged from this action; why defendants should not be permanently enjoined from making any further claim against [First Bank] relating to the Funds; and why [First Bank] should not be awarded its reasonable attorneys' fees and costs.

> IT IS FURTHER ORDERED that the Chalepah Group, the Maynahonah Group and the Garton Group, and any one of them are temporarily restrained from instituting or prosecuting any suit or proceeding against [First Bank] in any state or federal court affecting the [Funds].... [10]

¶ 6 On July 16, 2010, the court entered an order in which it stated "[t]he Chalepah Group, the Maynahonah Group, and the Garton Group have settled among themselves their rights to [the Funds]," and their agreement that the Funds should be "delivered to [t]he Maynahonah Group, which is the properly constituted Business Committee of the [Tribe]."[11] The court, therefore, ordered that the "Maynahonah Group is entitled to

filed, First Bank had been supplied with three BIA letters that recognized the Maynahonah Group as the winner of the Tribe's election, R. at 142 & Ex. A, and had been notified that the Tribal Council determined at its annual meeting on June 19, 2010, that the Maynahonah Group was the numerical winner of the election. R. at 142–43,185. The Maynahonah Group further claimed First Bank had notice that on July 1, 2010, one day after the interpleader action was filed and the order issued, but before the lawsuit had been served, the BIA "made a final decision that the Maynahonah Group was the rightful leaders of the [Tribe] based on the June 19, 2010 tribal council meeting." R. at 144 (p. 5 of Response), 190–94. The Maynahonah Group, therefore, argued that First Bank had no reason to file the interpleader which deprived the Tribe of critically needed funds necessary for essential governmental services.

First Bank's position, however, is that the Maynahonah Group's interpretation of the BIA letters, including the July 1, 2010 letter, did not necessarily resolve all of the concerns of the competing groups and First Bank's attorneys remained concerned about the letter's effect on those other groups. R. at 200, n.3. It referred to letters and emails it received, respectively, on June 8, 2010, R. at 108, and June 18, 2010, R. at 112, from attorneys for the other groups that

stated their claims to the Funds. In addition, it referenced an undated letter signed by the Assistant Secretary of the Department of the Interior (Interior) that, in light of the facts surrounding the appeal of the election results, "[f]ollowing tribal law, [Interior] will continue to recognize the incumbent members of the [Business Committee] as the Tribe's governing body." R. at 115. First Bank received this letter on June 18, 2010, from the attorneys for Chalepah Group. First Bank, therefore, argues it was still exposed to liability from multiple claims upon the Funds.

8. R. at 5.

9. The Maynahonah Group claimed the order—which also contains a temporary restraining order—is "null and void" because it was issued ex parte, before any summons had been served on it, and without a hearing to determine the propriety of the interpleader. R. at 144. First Bank did not deny this order was ex parte, but claimed the Maynahonah Group had had the opportunity to object to the order, but failed to take any such action. R. at 200, n.4.

10. R. at 10.

11. R. at 13.

the amount of [the Funds] in the accounts in the name of the [Tribe] which have been paid into Court, which funds total $488,813.86, and that [the Funds] shall be delivered immediately to counsel for the Maynahonah Group by check made payable to [the Tribe]." The order was signed "Agreed as to Form and Content" by the attorneys for the Maynahonah Group and Garton Group, but not by the attorneys for Chalepah Group.[12] First Bank received notice of the order via email from the attorney for the Maynahonah Group on July 20, 2010.[13]

¶ 7 On September 7, First Bank filed a "Notice of Objection to Order" to the July 16 order because, it claimed, the order failed to address or resolve the claim of Chalepah Group.[14] First Bank made this claim because the July 16 order was not signed by Chalepah Group's attorney. First Bank also objected to the order because it failed to provide for the payment of its attorney fees and costs. First Bank argued that it "was in the exact position contemplated by [12 O.S. 2011] § 2022 and ... did precisely what was directed by the" interpleader statutes.[15]

¶ 8 In response, the Maynahonah Group argued, among other matters, the trial court was without jurisdiction to award attorney fees to be paid from the Funds because the Funds were comprised of tribal funds and the Tribe had not waived its sovereign immunity.[16] Conversely, First Bank argued that the Maynahonah Group, in its capacity as the Business Committee of the Tribe, waived sovereign immunity when it drafted and submitted the July 16 order to the court and asked the court to release the Funds to it.[17]

¶ 9 On March 9, 2011, the court entered its Order awarding attorney fees and costs to First Bank in the total amount of $20,318.17 and ordered that sum "shall be paid by or on behalf of the Maynahonah Group, the persons who have current possession of the

---

12. R. at 14–16.

13. R. at 79, 196.

14. R. at 18. The individual service of summons for each of the members of Chalepah Group was apparently filed September 8, 2010. R. at 25–47.

15. R. at 51. Section 2022 provides, in part, as follows:

> A. Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability....
>
> ....
>
> C. The court may make an order for the safekeeping of the subject of the action or for its payment or delivery into the court or to such person as the court may direct, and the court may order the person who is seeking relief by way of interpleader to give a bond, payable to the clerk of the court, in such amount and with such surety as the court or judge may deem proper, conditioned upon the compliance with the future order or judgment of the court with respect to the subject matter of the controversy. Where the party seeking relief by way of interpleader claims no interest in the subject of the action and the subject of the action has been deposited with the court or with a person designated by the court, the court should discharge him from the action and from liability as to the claims of the other parties to the action with costs and, in the discretion of the court, a reasonable attorney fee.

> D. In cases of interpleader, costs may be adjudged for or against any party, except as provided in subsection C of this section.

16. It further argued that no case or controversy existed at the time First Bank filed the interpleader because within a day of its filing and before the lawsuit was served, First Bank knew about the action of the BIA recognizing the Maynahonah Group as the Business Committee and that it was the entity to which the Funds should have been released. See n.7, supra.

17. It also disagreed with the Maynahonah Group's argument that no interpleader was needed and asserted that to whom it should release the Funds was unclear even by the date of the motion for attorney fees in November 2010. Both parties refer this Court to other lawsuits involving Chalepah Group's continued assertion that it was the properly constituted Business Committee. The Maynahonah Group referenced a federal district court case upholding the administrative determination that the Maynahonah Group was the properly elected Business Committee. Reply Brief, App. 1–10. See also n.4, supra. First Bank referenced a bankruptcy action involving Chalepah Group's continued assertion during this period that it was the properly constituted Business Committee. Answer Brief at 24. First Bank argued the bankruptcy court's stay of its proceedings pending an asserted appeal of the district court case to the United States Court of Appeals for the Tenth Circuit demonstrates the continuing uncertainty about the group to which the Funds should have been released.

[Funds]." [18]  It is from this Order that the Maynahonah Group appeals.

## STANDARD OF REVIEW

¶ 10 In reviewing issues concerning tribal sovereign immunity, the Oklahoma Supreme Court has stated:

> The standard of review for questions concerning the jurisdictional power of the trial court to act is de novo. *Jackson v. Jackson*, 2002 OK 25, [¶ 2,] 45 P.3d 418 [, 422]. As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity. *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 [118 S.Ct. 1700, 140 L.Ed.2d 981] ... (1998). Waiver of sovereign immunity cannot be implied but must be unequivocally expressed. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 [98 S.Ct. 1670, 56 L.Ed.2d 106] ... (1978). Absent an effective waiver or consent, a state court may not exercise jurisdiction over a recognized Indian tribe. *Puyallup Tribe, Inc. v. Dept. of Game of State of Washington*, 433 U.S. 165, 172 [97 S.Ct. 2616, 53 L.Ed.2d 667] ... (1977).

*Dilliner v. Seneca–Cayuga Tribe*, 2011 OK 61, ¶ 12, 258 P.3d 516, 519.

## ANALYSIS

¶ 11 The Maynahonah Group's dispositive argument on appeal is that "[t]he trial court did not have jurisdiction to award ... attorney fees and costs against the Maynahonah Group [because] it has sovereign immunity from any claim for a money judgment against it." [19]  First Bank argues sovereign immunity presents no barrier to the trial court's award of attorney fees against the Funds of the Tribe for two reasons: (1) "[b]ecause Apache tribal law is silent on how sovereign immunity may be waived, the Maynahonah Group's consensual participation in the proceedings below constituted waiver"; [20] and (2) because "First Bank's interpleader action is *in rem* in nature[,] ... tribal sovereign immunity is not implicated." [21]

¶ 12 The Tribe is a federally-recognized Indian tribe and, as such, is subject to suit only by congressional authority or by the Tribe's waiver of its immunity. *Kiowa Tribe*, 523 U.S. at 754, 118 S.Ct. 1700. Tribal immunity from suit is recognized as "needed to safeguard tribal self-governance." *Id.* at 758, 118 S.Ct. 1700. "This immunity extends to tribal officials, so long as they are acting within the scope of their official capacities." *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir.2011) (citations omitted). For the reasons discussed herein, we conclude the trial court was without jurisdiction to award attorney fees and costs to First Bank against the Tribe's assets because the record fails to show that the Tribal Council expressly authorized the Maynahonah Group to waive the Tribe's sovereign immunity when it complied with the trial court's June 30 order requesting release of those Funds to the Tribe.

### I. Maynahonah Group's Authority to Waive the Tribe's Sovereign Immunity

¶ 13 First Bank argues that "[b]ecause Apache tribal law is silent as to how sovereign immunity may be waived, no specific action by *any* tribal entity is required before waiver may occur." [22]  First Bank

---

18. R. at 234.

19. Brief-in-chief at 6. Because we decide this appeal on the jurisdictional issue, we decline to address the Maynahonah Group's remaining issues.

20. Answer Brief at 8.

21. Answer Brief at 17.

22. Answer Brief at 9 (emphasis added). At the outset, we note that in its arguments below, First Bank did not expressly raise the issue of the authority of the Maynahonah Group to waive the Tribe's immunity. It is not the duty of this Court to make first-instance determinations of questions of law. *Evers v. FSF Overlake Assocs.*, 2003 OK 53, ¶ 18, 77 P.3d 581, 587. However, while the precise issue of authority to waive immunity was not argued below, the issue of the Tribe's sovereign immunity and the Maynahonah Group's purported waiver of that immunity were. As on appeal, First Bank argued below that the Maynahonah Group waived the Tribe's immunity by complying with the June 30 Order of Interpleader. The trial court awarded attorney fees and costs against the Funds; thus, it implicitly determined the Maynahonah Group not only waived the Tribe's immunity as to the Funds, but

challenges the Maynahonah Group's "claim that 'only the Apache Tribal Council can waive sovereign immunity on behalf of the Tribe' [as being] entirely without support." [23] First Bank distinguishes the cases upon which the Maynahonah Group relies for the proposition that state courts must follow tribal law [24] and, thus, discounts the Maynahonah Group's argument that pursuant to the Tribe's constitution, only the tribal council can waive the Tribe's sovereign immunity. First Bank argues those cases are distinguishable because, in addition to tribal law that stated which governing body had the supreme authority to waive immunity, in those cases some articulated process or procedure was identified by which the tribe could authorize waiver of its sovereign immunity.[25]

¶ 14 Instead, First Bank argues that generalized and ambiguous provisions of tribal law should not control. It urges this Court to adopt the view of a Colorado appellate court that applied state agency law in determining that the tribe authorized an apparent agent to waive immunity.[26] We find nothing in the cases relied upon by First Bank that persuades us to reach such a conclusion under the facts of this case.

¶ 15 First Bank's argument requires some context. In each of the cases upon which First Bank relies, a contract was in dispute; a contract executed by a tribal representative who had authority to execute the contract and one that expressly waived the tribe's sovereign immunity with respect to disputes arising under those contracts. The issue in those cases was whether the tribe authorized the representative to waive the tribe's immu-

nity and what legal basis was required to demonstrate whether the tribe gave such authorization. In the present case, no contract is in dispute. First Bank repeatedly asserts it is not a stakeholder with respect to the Funds. Therefore, unlike the non-tribal parties to the disputed contracts in the cases upon which First Bank relies who did have such a stake, First Bank did not rely on any authority the Maynahonah Group may have had over the Funds. Indeed, First Bank's reason for filing the interpleader was its inability to determine who had authority to claim the Funds on the Tribe's behalf. It is in this context that we consider First Bank's first proposition.

¶ 16 First Bank relies on *Stillaguamish Tribe of Indians v. Pilchuck Group II, L.L.C.,* No. C10–995RAJ, 2011 WL 4001088 (W.D.Wash. Sept. 2, 2011) (unpublished), for its argument that "where courts have considered questions of waiver in the absence of any clear guidance from tribal law, they have rejected the contention that generalized and ambiguous provisions of tribal law control." [27] In *Stillaguamish,* the chief executive officer (CEO) of the tribe's tribal enterprise corporation signed a "working agreement" on behalf of the tribe that contained an arbitration clause and a waiver of the tribe's sovereign immunity. Prior to the time he signed that agreement, the CEO had been chairman of the tribe's board of directors. *Id.* at *2. According to the *Stillaguamish* Court, "[n]o one disputes that the Agreement, had the Tribe actually authorized it, would be effective to bind the Tribe to arbitration over any disputes arising under the contract." *Id.* at *1. The questions before the court on the

---

also had the authority to waive the Tribe's immunity. Consequently, in this *de novo* review, we will address the Maynahonah Group's authority to waive immunity. *See Keota Mills & Elevator v. Gamble,* 2010 OK 12, ¶ 19, 243 P.3d 1156, 1162 ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of the governing law.") (footnote omitted).

**23.** Answer Brief at 11.

**24.** The Maynahonah Group relies on *Dilliner and Memphis Biofuels, LLC v. Chickasaw Nation In-*

*dustries, Inc.,* 585 F.3d 917 (6th Cir.2009), among other precedent.

**25.** *See, e.g., Dilliner,* ¶¶ 2–3, 258 P.3d at 517 (the tribe's constitution and a resolution passed by its business committee explained how authority to waive could be conferred); *Sanderlin v. Seminole Tribe of Fla.,* 243 F.3d 1282, 1287 (11th Cir. 2001) (tribe's constitution and an ordinance passed by the tribal council explained how authority to waive immunity could be conferred).

**26.** Answer Brief at 13–14.

**27.** Answer Brief at 12.

parties' motions for summary judgment were whether the tribe authorized the agreement and, in particular, whether it authorized the arbitration clause and sovereign immunity waiver. The court ultimately determined, as First Bank notes, that the tribe had not waived its sovereign immunity.

¶ 17 The *Stillaguamish* Court reiterated that "tribes are subject to suit 'only where Congress has authorized the suit or the tribe has waived its immunity,'" *id.* at *4 (quoting *Kiowa Tribe*, 523 U.S. at 754, 118 S.Ct. 1700), and that "[a] tribe's waiver of immunity must have the 'requisite clarity,'" *id.* (quoting *C & L Enters., Inc. v. Potawatomi Indian Tribe*, 532 U.S. 411, 418, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001)). The court further noted that the level of clarity needed for an enforceable waiver has been refined by various cases. Thus, a waiver may have the requisite clarity even if a contract clause does not contain the words "sovereign immunity," but any such waiver must be express, not implied. In *Stillaguamish*, the only waiver was the express waiver in the agreement and none of the parties disputed that waiver had the requisite clarity. The question was whether the tribe agreed to the waiver.

¶ 18 As First Bank states, the court rejected the tribe's argument that because it did not expressly authorize the official to sign the agreement the debate was ended.

> The Tribe's position ignores that its "policies" for authorizing agents to enter contracts or waive sovereign immunity are nebulous at best. The Tribe's constitution is silent regarding who may waive the Tribe's immunity or the procedures for doing so. Until [four years after the agreement was signed], no Board resolution or other formal document set forth policies and procedure for waiving immunity.

*Id.* at *5 (footnote omitted). The court went on to observe, however, that at the time the official signed the agreement,

> the Tribe had no consistent practice for authorizing people to enter contracts or waive sovereign immunity on its behalf.... Board members contend that the Board's practice was to authorize contracts

and sovereign immunity waivers only in written resolutions of the Board. This contention is flatly incorrect. The record reflects that many people have signed contracts purportedly on behalf of the Tribe without any Tribal Board resolution authorizing the act.... None of these agreements contain[s] an express sovereign immunity waiver. The record reflects that while the Tribe entered many contracts pursuant to a written resolution of the Tribal Board, it also entered many contracts without a resolution or any other express approval from the Tribal Board. The record also reflects that agents purporting to act on behalf of the Tribe (most often members of the Board) frequently entered contracts on behalf of the Tribe without the written approval of the Board.

*Id.*

¶ 19 It was in light of these circumstances—no express policy or procedure and an inconsistent practice of authorizing the waiver of sovereign immunity—that the *Stillaguamish* Court concluded the absence of the tribe's express authorization to waive immunity did not end the debate as to whether the tribe *actually* authorized the CEO to waive its sovereign immunity. However, upon consideration of the undisputed facts presented, the court found, as a matter of law, that no facts revealed the tribe's approval of the waiver of immunity for disputes arising out of the agreement. *Id.* at 6, 7.

¶ 20 Though not referenced by First Bank, the *Stillaguamish* Court also expressly rejected the agency principles proffered by the non-tribal defendant to establish the official's authority to act on the tribe's behalf. *Id.* at *5. The court specifically discussed the "thorny choice of law questions" raised by the defendant's argument. *Id.* The court noted that the defendant had not adequately explained why state law should apply to questions of tribal authority, or explain how such an "approach avoids the Supreme Court's admonition that 'tribal immunity is a matter of federal law and is not subject to diminution by the States.'" *Id.* (quoting *Kiowa Tribe*, 523 U.S. at 756, 118 S.Ct. 1700).

¶ 21 The *Stillaguamish* Court recognized that the tribe's constitution was silent on the issues of what powers the tribe can delegate to lesser officials and whether agency principles are generally applicable. It observed that no resolutions of the Board established generally applicable tribal agency principles. Yet, the court did not find the absence of these matters to be grounds for applying state common law to questions of tribal authority. The court also observed that, "[f]ederal courts have occasionally applied federal common law in disputes involving tribes" but it stated it found "no precedent that binds this court [to apply] federal common law to the question of a tribal agent's power to waive sovereign immunity." *Stillaguamish*, 2011 WL 4001088, at *6. The court thus concluded that state law had no bearing on who had the authority to waive the tribe's sovereign immunity.

¶ 22 Although the *Stillaguamish* Court specifically declined to adopt the conclusion and reasoning in another case upon which First Bank relies, *Rush Creek Solutions, Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402 (Colo.App.2004), First Bank argues *Rush* supports its contention that state apparent authority principles should apply to determine whether a tribe has waived sovereign immunity. As was true in *Stillaguamish*, the waiver contained in the disputed contract expressly waived the tribe's immunity. *Id.* at 406. In *Rush*, the Colorado appellate court applied state apparent authority principles to determine that the tribe authorized the chief financial officer (CFO) to waive immunity.

¶ 23 In *Rush*, the tribe argued that pursuant to its constitution, the tribal council was the "governing body with exclusive power over tribal matters" including the right to waive immunity, and the tribal council never gave the CFO authority to waive its immunity. *Id.* at 406. The court said, however, that the authority to waive sovereign immunity may be implied—even though waiver of immunity must be express, not implied. It rejected a federal district court's conclusion that because waivers of sovereign immunity must be clear and express, the authority to waive immunity must also be expressly

granted. The *Rush* Court said it found nothing in the federal cases to mean that "because waivers of sovereign immunity must be express, the authority to sign *admitted waivers* cannot be established by apparent authority." *Id.* at 407 (emphasis added). The court also concluded that inasmuch as the tribe's constitution did not speak to the issue of apparent authority, or prohibit or refute it, general laws of agency govern. It then applied Colorado's laws concerning apparent authority.

¶ 24 Among the Colorado common law upon which the *Rush* Court relied is that apparent authority is established by evidence of the principal's words, written or spoken, or other conduct of the principal "which, reasonably interpreted, causes a person to believe that the principal consents to have the act done on his behalf by a person purporting to act for him." *Id.* (citation omitted). The court reasoned that the policy supporting apparent authority—an authority that is not actual or express—is for the protection of "third parties who, in good faith, rely upon their belief that an agency relationship exists between the apparent principal and agent." *Id.* (citation omitted). Further, under Colorado law, if the agent is acting pursuant to apparent authority, the agent can make the principal responsible for his or her actions regardless of the principal's knowledge about the agent's conduct.

¶ 25 The court stated that ordinarily the issue of apparent authority is a question of fact that requires a hearing. In *Rush*, the issue of the CFO's apparent authority had not been addressed by the trial court. *Id.* at 406. However, the court concluded the undisputed facts allowed it to make that determination on appeal as a matter of law. According to the court, at all relevant times: the CFO was authorized to enter into contracts on behalf of the tribe; the contract at issue designated the tribe as the customer; the CFO signed on behalf of the customer on a line designated for authorized signatures; the plaintiff and the tribe performed their respective duties under the contract, including the making of payments by the tribe to the plaintiff, for eighteen months before the dispute arose; and the tribe's "Constitution

and personnel policy [were] silent concerning procedures for signing contracts, waiving sovereign immunity, or authorizing persons to sign waivers." *Id.* at 407. Under those facts the court said that "[w]hen, as here, a person has authority to sign an agreement on behalf of a sovereign, it is assumed that *the authority extends to a waiver of immunity contained in the agreement.*" *Id.* at 408 (emphasis added, citation omitted).

¶ 26 Although First Bank discusses parts of *Stillaguamish* and *Rush,* it offers no argument about why or how the reasoning in those cases, particularly *Rush,* [28] applies to the facts before us to demonstrate that the Apache Tribal Council authorized the Maynahonah Group to waive the Tribe's immunity when the Maynahonah Group sought the release of the Funds from the trial court. Conferral of that authority is the threshold question. Those cases clearly do not stand for the proposition that no action "by any tribal entity" [29] is needed to confer authority upon another to waive the Tribe's immunity. The absence of a process or procedure in those cases, in other words, did not *ipso facto* mean the authority to waive immunity was conferred.

¶ 27 The *Stillaguamish* and *Rush* Courts specifically looked to the particular circumstances before them, including the words and conduct of the requisite governing body, to determine whether that body conferred such authority. First Bank points to no facts—and we can discern none—in the present lawsuit concerning the words or conduct of the Tribal Council that demonstrate it conferred the authority to waive immunity on the Maynahonah Group. Instead, First Bank appears to be making the argument

that, in the absence of an identified procedure or process by which the Tribe can authorize waiver of its immunity, anyone who is authorized to act on the Tribe's behalf for any particular purpose is by virtue of the authority to act, authorized to waive the Tribe's immunity. We do not read *Stillaguamish* or *Rush* as advocating such a far—reaching result and we decline to do so as well.

¶ 28 In the present case, pursuant to Article V of the Apache Constitution,

[The Business Committee] shall [h]ave such powers as may be delegated to it by appropriate resolutions of the tribal council, and, within such delegated authority, may transact business and otherwise speak or act on behalf of the [T]ribe in all matters on which the [T]ribe is empowered to act now or in the future.[30]

The record contains no resolution authorizing the Maynahonah Group to waive the Tribe's sovereign immunity in seeking return of the Funds in the interpleader action. No particular policy or procedure appears in the record on appeal about how the Tribal Council could authorize the Business Committee, or any other tribal official or·entity, to waive immunity. However, unlike the circumstances in *Stillaguamish,* nothing in the record reveals the Tribal Council engaged in an inconsistent "practice for authorizing people to . . . waive sovereign immunity on its behalf." 2011 WL 4001088 at *5. As we read *Stillaguamish,* the consistency of the tribe's practice is critical in determining whether the governing body authorized waiver of immunity when tribal policies and procedures are silent on the matter.[31]

---

**28.** We do not reach any conclusion about the analysis in *Rush* and that court's application of its state's agency laws to the question of a tribe's determination about who has the authority to waive its sovereign immunity. We need not do so. By whatever means that court reached the conclusion that the governing tribal body, by word or conduct, conferred authority on the CFO to waive the tribe's immunity, in the present case the appellate record is devoid of evidence of the actions or words of the Apache Tribal Council that operated to confer such authority on the Maynahonah Group. Significantly, First Bank has offered no argument about what or how Oklahoma agency law should be applied in this

case. Okla. Sup. Ct. R. 1.11(k)(1), 12 O.S.2011, ch. 15, app. 1. Thus, we need not consider it.

**29.** Answer Brief at 9.

**30.** R. at 123.

**31.** We also note that while the Apache Constitution does not set out a procedure for waiver of immunity, it is not silent about the method by which business is to be transacted by the tribal council. Article VI, section 1, clearly states that the tribal council shall hold an annual meeting on a day certain each year "for the purpose of receiving reports and transacting any other busi-

¶ 29 Nor do we conclude that the deference to tribal law mandated by *Dilliner* is confined to circumstances where there is not only tribal law conferring authority to waive immunity on a governing body, but also where there are express tribal policies and procedures about how authority to waive may be conferred upon others. Absent any evidence that the tribal council has given such authorization in haphazard or inconsistent ways, we do not understand *Dilliner* to mean we are to give no deference to the Tribe's constitutional law that invests supreme authority in the Tribal Council and gives the Business Committee the authority to speak on behalf of the Tribe only by and within the authority of resolutions passed by the Tribal Council.[32] Moreover, although in *Dilliner* both the tribe's constitution and resolutions passed by its business committee set out how authority to waive immunity could be conferred, unlike the conclusion reached in *Rush,* the Oklahoma Supreme Court in *Dilliner* concluded that the authority must be express, not implied.[33] We do not understand *Dilliner* to mean that if a tribe has no express process for waiver of immunity, then tribal constitutional law can be discarded.

¶ 30 Based on the facts of this case, we conclude the Tribal Council conferred no express or implied authority on the Maynahonah Group to waive the Tribe's sovereign immunity as to the Funds. Consequently, we do not address the question of whether waiver of the Tribe's immunity was effected through the Maynahonah Group's compliance with the Order of Interpleader to gain release of the Funds to the Tribe needed to operate essential governmental and social tribal services and programs.

### II. Tribal Sovereign Immunity Extends to Interpleader Actions

■ ¶ 31 First Bank concedes the interpleader action and the ancillary award of costs and attorney fees were against tribal funds.[34] However, it argues that inasmuch as interpleader actions are *in rem,* tribal sovereign immunity was not implicated because the interpleader was not against the Tribe or its individual members.[35] First Bank supports this conclusion through reliance on *County of Yakima v. Confederated Tribes*

---

ness which may come regularly before the Apache Tribal Council." Section 2 of the same article provides for the calling of special meetings of the council for particular purposes, but also provides for the transacting of other business if certain notice provisions are followed. Thus, the Apache Constitution provides a method by which the Tribal Council can transact the Tribe's business including authorizing others to act on the Tribe's behalf.

Further, the only Tribal Council resolution of record in this case is the June 19, 2010 resolution declaring the Maynahonah Group the properly elected and constituted Business Committee. R. at 185. The last paragraph of that resolution states that, as the supreme governing body of the Tribe, the Tribal Council is the sole interpreter of the Apache Constitution. R. at 188. The passage of this resolution at the constitutionally mandated annual meeting and the Tribal Council's assertion of at least one of its powers as the supreme governing body, suggests the Tribe is consistent as to the process by which it transacts its business.

**32.** We note the *Stillaguamish* Court appears to have reached the same conclusion about the effect of *Dilliner.* In support of its conclusion that "state law plays no role in deciding whether a Tribe has waived its sovereign immunity," the court cited *Dilliner* for the proposition that tribal law governs how immunity can be waived by a

tribe. *Stillaguamish,* 2011 WL 4001088, at *6. The *Stillaguamish* Court, therefore, was not persuaded that the absence of policies and procedures for authority to waive immunity diminished the *Dilliner* mandate. *Id.* at *6 n. 5. *See also Sanderlin,* 243 F.3d at 1288 (in the context of the facts before it, extending authority to waive tribal immunity through agency principles is "directly contrary to the Supreme Court's clear statement that 'a waiver of sovereign immunity cannot be implied but must be unequivocally expressed.' ") (citations and internal quotation marks omitted).

**33.** The plaintiff in *Dilliner* argued that because the business committee granted authority to the chief to sign employment contracts with tribal employees, the contracts must have been approved and ratified in all particulars including the limited waiver of sovereign immunity contained within them. In answer to that contention the Supreme Court stated, "[f]ederal law requires that the waiver of sovereign immunity [must] be express and unequivocal; it cannot be implied. The Tribe's Constitution and its By-Laws do not authorize the Chief to waive the Tribe's immunity." *Dilliner,* ¶ 19, 258 P.3d at 520.

**34.** Answer Brief at 20.

**35.** Answer Brief at 20–21.

*and Bands of the Yakima Indian Nation,* 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992), as well as several cases from other states.[36]

¶ 32 *Yakima* involved application of the Indian General Allotment Act, 25 U.S.C. § 348 (2012), an Act authorizing, among other matters, taxation of fee-patented land, to the County of Yakima's imposition of an ad valorem levy on taxable fee-patented land within its jurisdiction and held by the Yakima Indian Nation or its members on the tribe's reservation within the county. Referencing the 1906 amendment to the Act—the Burke Act—the *Yakima* Court said, the Act "manifest[ed] a clear intention to permit the state to tax" fee-patented Indian lands. 502 U.S. at 259, 112 S.Ct. 683 (citation omitted). At issue in *Yakima,* however, was the Tribe and United States' contention that subsequent legislation repudiated this explicit conferral of a state's taking authority "at least within the confines of an Indian reservation." *Id.* at 260, 112 S.Ct. 683. The Court did not agree. *Id.* at 261–66, 112 S.Ct. 683. However, it did find a difference between the two separate taxes Yakima County sought to impose: an ad valorem tax and an excise tax on sales.

¶ 33 As to the ad valorem tax, the Court said, "Liability for the ad valorem tax flows exclusively from ownership of realty on the annual date of assessment. The tax ... creates a burden on the property alone." *Id.* at 266, 112 S.Ct. 683 (citations omitted). Therefore, the Court concluded, "this ad valorem tax constitutes 'taxation of ... land' within the meaning of the General Allotment Act and is therefore prima facie valid." *Id.* [37] The Court, however, stated "the excise tax on sales of fee land is another matter...." Id. at 268, 112 S.Ct. 683. The Court reasoned: "While the Burke Act proviso does not purport to describe the entire range of in rem jurisdiction States may exercise with respect to fee-patented reservation land, we think it does describe the entire range of *jurisdiction to tax....* [T]hat description is 'taxation of ... land.'" *Id.* The Court disagreed with Yakima County's attempt to expand that text by arguing the proviso is evidence of "congressional intent to subject an Indian allotment to *all* taxes." *Id.* [38] The Court said the General Allotment Act only explicitly authorizes "'taxation of ... land,'

36. These cases are also cases that involved fee-patented land. First Bank also relies on a federal bankruptcy case, *In re McCoy,* Bankr.No. 07–02998–EE, 2009 WL 2835258, at *4 (Bankr. S.D.Miss. Aug. 31, 2009) (unpublished), for the proposition that "'[p]roceedings ancillary to *in rem* actions likewise do not implicate sovereign immunity.'" Answer Brief at 19–20. *McCoy,* however, involved the court's discussion of the Eleventh Amendment in a context wholly unrelated to tribal sovereign immunity and tribal funds. *See also Kiowa Tribe,* 523 U.S. at 756, 118 S.Ct. 1700 ("[T]he immunity possessed by Indian tribes is not coextensive with that of the States.").

37. The Court rejected the ruling in this case by the United States Court of Appeals for the Ninth Circuit that "the Yakima Nation has a 'protectable interest' against imposition of the tax on Tribe members upon demonstration of the evils described in" *Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation,* 492 U.S. 408, 431, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989), a case that "grew out of a long line of cases exploring the very narrow powers reserved to tribes over the conduct of non-Indians within their reservations." *Yakima,* 502 U.S. at 267, 112 S.Ct. 683 (citation omitted). The Court said *Brendale* and its reasoning were not applicable to the case before it because *Yakima* did not involve an extension of a tribe's inherent sovereign pow-

ers, but rather "an asserted restriction of a State's congressionally conferred powers." *Yakima,* 502 U.S. at 267, 112 S.Ct. 683. Where a state is permitted the right to tax, the Court said the balancing of interest tests set forth in *Brendale* "is not the appropriate gauge for determining validity [of the tax because] it is that very balancing which we have reserved to Congress." *Id.* (citation omitted).

38. The Court stated that a reading of the Burke Act proviso that includes within the meaning of "taxation of land" taxation of the proceeds from the sale of that land, is not an unwarranted construction interpreting "taxation of land," but it is not "the phrase's unambiguous meaning.... [Thus, while] the object of the *sale* here is land, that does not make land the object of the *tax,* and hence does not invoke the Burke Act proviso." *Yakima,* 502 U.S. at 268–69, 112 S.Ct. 683. Consequently, in keeping with the deeply rooted principle "in this Court's Indian jurisprudence [that] ... '[s]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit,'" the Court concluded the state's attempt to tax the activity of selling the land was void regardless of the means devised for its collection. *Id.* at 269, 112 S.Ct. 683.

not 'taxation with respect to land,' 'taxation of transactions involving land,' or 'taxation based on the value of land.' " *Id.* at 269, 112 S.Ct. 683.

¶ 34 We do not agree with First Bank's assertion that Yakima, and the other precedent upon which it relies, are authority that "plainly demonstrate that tribal sovereign immunity does not bar the exercise of *in rem* jurisdiction over tribal property, even when a tribe loses some part of that property as a result." [39] We are not persuaded that the issues in *Yakima* and the reasoning expressed therein have any application to the issue presently on appeal. Importantly, as First Bank notes, the cases upon which the Court in *Yakima* relies all deal with fee-patented Indian land. As the opinion in *Yakima* demonstrates, the history of the federal legislation and judicial precedent discussed therein concern Indian lands, not tribal funds—land, the *Yakima* Court concluded, that congressional action allowed to be affected in some way by the states. In that regard, the cases upon which First Bank relies concern state or local governmental action— "taxation of ... land," eminent domain, condemnation—against fee-patented Indian land, not a governmental or private entity's attempt to take "some part" of tribal funds in a state court proceeding. The *Yakima* Court—while distinguishing the case before it from various precedent—did not challenge precedent in which the Court was concerned with "conduct [that] threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 267, 112 S.Ct. 683 (citation omitted).

¶ 35 Consequently, First Bank's authority fails to support the conclusion that recognition of a tribe's sovereign immunity rests on whether the judicial proceedings are in the nature of an *in rem* or an *in personam* action. That is, nothing in the cases presented demonstrates why an interpleader action, in which tribal funds are placed within the jurisdiction and control of a state district court, are exempt from the requirement that judicial proceedings may not be commenced against a federally-recognized tribe absent express congressional authority or through the consent of the tribe. The Tenth Circuit, however, has had occasion to determine whether sovereign immunity is a bar to interpleader in *Bank of Oklahoma v. Muscogee (Creek) Nation,* 972 F.2d 1166 (10th Cir. 1992).

¶ 36 In that case, among other things, the district court dismissed the Bank's interpleader action based on the Nation's sovereign immunity and requirements that the parties exhaust tribal court remedies. *Id.* at 1168. In examining the district court's finding that it was without subject matter jurisdiction over the interpleader action, the appellate court reiterated the rule that "[s]uits against Indian tribes are barred by sovereign immunity absent either a clear waiver by the tribe or congressional abrogation." *Id.* at 1169 (citations omitted). "The Bank argues for an exception to this well settled law in the case of an interpleader.... [W]e hold that no such exception is warranted." *Id.*

¶ 37 We recognize the facts in *Bank of Oklahoma* differ from the present case in that there the Muscogee (Creek) Nation did not comply with any order of the district court as did the Maynahonah Group in this lawsuit, and the Muscogee (Creek) Nation, unlike the Apache Tribe, has a tribal court system.[40] Significant to this lawsuit, however, is the Tenth Circuit's determination that sovereign immunity bars an interpleader action absent clear waiver. Therefore, regardless of whether interpleader is an *in rem* or

---

39. Answer Brief at 20.

40. The court rejected Bank of Oklahoma's argument about the inadequacy of a remedy if the Bank were to pursue interpleader in the Muscogee (Creek) Nation tribal courts. 972 F.2d at 1169–70. In the present case, the Tribe has no tribal court structure; consequently, the exhaustion argument discussed in *Bank of Oklahoma* is inapplicable to the present lawsuit. The Bank, however, also urged several other arguments about why interpleader should be permitted that did not rely on the existence or use of a tribal court system. The court rejected those arguments as well. One of those arguments was the policy argument that without the ability to file interpleader actions against tribes, banks would be hesitant to do business with them. In rejecting that policy argument, the court observed, "the point of sovereign immunity ... is the power of self-determination." *Id.* at 1169.

*in personam* proceeding, it is a lawsuit. We, therefore, conclude, that absent tribal waiver or congressional consent, sovereign immunity bars an interpleader suit against a tribe. *Id.* at 1169. *See also Kiowa Tribe*, 523 U.S. at 756, 118 S.Ct. 1700 ("[T]ribal immunity is a matter of federal law and is not subject to diminution by the States.") (citation omitted).

¶ 38 We are also persuaded by the conclusion reached in *Bank of Oklahoma* because of the particular facts presented in this lawsuit. The Funds here are very different from the fee-patented lands in *Yakima* and the other cases upon which First Bank relies. The *res* at issue is money used as tribal operating funds. At all times, First Bank knew the Funds belonged to the Tribe. Moreover, the record demonstrates First Bank knew the Funds were assets of the Tribe immediately needed for the operation of its daily governmental functions and social services for its citizens. These are matters clearly within the Tribe's sovereign powers, powers this Court would directly infringe if the Funds were subject to erosion through interpleader.

¶ 39 In light of our conclusion that this interpleader action is barred by sovereign immunity because the tribe did not waive immunity, the trial court was without jurisdiction to award attorney fees and costs to First Bank pursuant to 12 O.S.2011 § 2022(D).

## CONCLUSION

¶ 40 We conclude the Tribe, under the facts of this case, did not authorize the Maynahonah Group to waive its sovereign immunity. Consequently, based on the applicable law and facts, the Tribe did not waive its sovereign immunity when the Maynahonah Group complied with the Order of Interpleader and submitted an order to the trial court seeking release of the Funds to the Tribe. Further, we conclude sovereign immunity bars an action of interpleader against a federally-recognized Indian tribe in the absence of the tribe's clear and express waiver of immunity or congressional consent to such waiver. Because no such waiver occurred in this case, the trial court was without jurisdiction to award attorney fees and costs to First Bank from the Funds. Accordingly, we reverse the district court's Order.

¶ 41 **REVERSED.**

WISEMAN, J., concurs.

THORNBRUGH, J. (sitting by designation), dissents.

THORNBRUGH, J. (sitting by designation), dissenting.

¶ 1 I respectfully dissent. The disputed funds were interplead specifically so that they would be held under the protection of the force of law of the sovereign state of Oklahoma. The tribal appellants neither objected nor sought to remove the matter to federal court, where they were involved in a dispute involving some of the same issues surrounding authority to assert control on behalf of the Tribe. Indeed, there is a strong case to be made that, at the time of the interpleader, it was uncertain as to which group would ultimately prevail in the ongoing leadership struggle within the Tribe itself.

¶ 2 Against this backdrop of uncertainty the Maynahonah group seemed quite content to allow the Oklahoma district court to enter an order directing the Bank to pay the funds into court in order to protect the funds until such time as the Tribe could sort out who had the right to control the account. The Maynahonah group then took full advantage of the power of the Oklahoma court to distribute the interplead funds in an order that the group agreed to **in form and in content.** Having secured the funds as a result of the exercise of the sovereign power of the State of Oklahoma, the Tribe now repudiates the right of the court to manage the funds in the first instance.

¶ 3 I dissent from any notion that the Tribe may now assert sovereign immunity to defeat the authority of the Oklahoma district court to enter an order awarding statutory costs and attorneys fees associated with a state interpleader action to which the tribe did not object. I would hold the Tribe waived any claim it may have had to sovereign immunity under the circumstances of this case. I would invoke the maxim *volenti*

*non fit injuria:* He who consents cannot receive an injury.

¶ 4 I make no comment as to whether the fee awarded the Bank was proper or equitable since I am unable to reach this question given the decision of the majority.