2015 OK CIV APP 10

**WELLS FARGO BANK, NATIONAL ASSOCIATION, Plaintiff/Appellee,**

v.

**APACHE TRIBE OF OKLAHOMA, Defendant/Appellant.**

No. 110,194.

Court of Civil Appeals of Oklahoma, Division No. 2.

April 4, 2014.

Jon E. Brightmire, Doerner, Saunders, Daniel & Anderson, L.L.P., Tulsa, Oklahoma, for Defendant/Appellant.

Patrick M. Ryan, Phillip G. Whaley, Ryan Whaley Coldiron Shandy PLLC, Oklahoma City, Oklahoma, and Jerome A. Miranowski, Michael M. Krauss, Faegre Baker Daniels LLP, Minneapolis, Minnesota, for Plaintiff/Appellee.

JOHN F. FISCHER, Presiding Judge.

¶1 This case arises from Wells Fargo Bank's efforts to collect the balance of a $4,365,000 loan to the Apache Tribe of Oklahoma. The Tribe appeals various rulings of the district court in these consolidated appeals.[1] Principally, the Tribe challenges the district court's Judgment confirming an arbitration award in favor of the Bank, arguing it did not waive sovereign immunity or consent to be sued in Oklahoma district court. We find that there was a valid and express waiver of the Tribe's sovereign immunity, that the Tribe's agreement to arbitrate this dispute with the Bank is enforceable and that the arbitrator did not exceed his authority in awarding the Bank the unpaid balance of its loan. Therefore, the district court's Judgment confirming that portion of the arbitration award is affirmed as are the subsequent orders issued in aid of the Bank's effort to collect its Judgment.[2]

## BACKGROUND

¶2 The Apache Tribe of Oklahoma is a federally recognized Indian tribe. The Tribe adopted a Constitution in 1972. Pursuant to Article II of that Constitution, the members

---

1. Although Judge Graves issued the Judgment confirming the arbitration award, Judge Croy issued the subsequent orders appealed.

2. This Opinion was originally issued on December 31, 2013. We granted rehearing at the Tribe's request to address supplemental authorities relied on by the Tribe.

of the Tribe who are at least eighteen years of age constitute the General Council and the General Council is the "supreme governing body" of the Tribe.[3] The Business Committee of the Apache Tribe of Oklahoma was established by the tribal council pursuant to authority granted in Article V of the Tribe's Constitution: "There shall be a business committee which shall consist of the officers as provided in Article IV and two (2) members." On August 26, 1972, the tribal council passed Resolution 73–1 delegating the Tribe's "full and complete authority to the Business Committee to transact any and all business related to the tribe involving matters such as tribal land, tribal budget and any other matters relating to government programs and the Bureau of Indian Affairs...." On September 10, 1977, the tribal council passed Resolution 78–7 to "go on record similar to Resolution 73–1 to delegate authority to transact business related to the Apache Tribe of Oklahoma" to the Business Committee.

¶3 On May 9, 2006, the Tribe opened its Silver Buffalo Casino in Anadarko, Oklahoma. In August of 2007, members of the Business Committee and Wells Fargo Bank discussed a possible loan in the amount of $4,365,000. The loan proceeds were intended to be used by the Tribe to pay off existing debt, expand and remodel the Casino and to acquire land. On June 23, 2008, the Business Committee, by a vote of 3 to 0, adopted Resolution 06–23–08 approving the financing transaction with the Bank and the documents necessary to complete the loan transaction. The Resolution contained an express waiver of the Tribe's sovereign immunity. Also on June 23, 2008, the Business Committee signed a loan agreement, promissory note, security agreement and related documents (Loan Agreement) with the Bank to complete the loan transaction. The Loan Agreement included a waiver of the Tribe's sovereign immunity with respect to the loan transaction, an agreement to arbitrate disputes with the Bank and a choice of law provision desig-

nating Oklahoma law for the construction and enforcement of the Loan Agreement.

¶4 Paragraph 11.19 of the Loan Agreement titled "Governing Law," provides, in part:

(a) This Agreement and the Loan Documents shall be governed by, construed and enforced in accordance with, the internal law of the State of Oklahoma.... The [Tribe] ... consents to the application of Oklahoma civil law to the construction, interpretation and enforcement of this Agreement and the other Loan Documents, and to the application of Oklahoma civil law to the procedural aspects of any suit, action or proceeding relating thereto, including, but not limited to, legal process, execution of judgments, enforcement of any arbitration award and other legal remedies....

¶5 Paragraph 11.24 of the Loan Agreement provides, in part:

(a) *Arbitration.* Upon the demand of any party, any Dispute ... shall be resolved by binding arbitration in accordance with the terms of this Agreement. A "Dispute" means any action, dispute, claim, or controversy of any kind, whether in contract or tort, statutory or common law, legal or equitable, now existing or hereafter arising under or in connection with, or in any way pertaining to any of the Loan Documents....

(b) *Governing Rules.* Arbitration proceedings shall be administered by the American Arbitration Association ("AAA") or such other administrator as the parties shall mutually agree upon in accordance with the AAA Commercial Arbitration Rules. All Disputes submitted to arbitration shall be resolved in accordance with the Federal Arbitration Act.... Judgment upon any award rendered in an arbitration may be entered in any court having jurisdiction....

¶6 Paragraph 11.27 of the Loan Agreement is titled: "WAIVER OF SOVEREIGN

---

**3.** Although the Tribe's Constitution refers to a "tribal council," the Tribe's documents in this record refer to a "general council" rather than the tribal council. It was established at oral argument that the terms are used interchange-

ably and describe the same entity, the "supreme governing body of the Apache Tribe of Oklahoma." We will refer to the Tribe's governing body as the General Council.

IMMUNITY; CONSENT TO JURISDICTION, and provides, in part:

(A) THE [TRIBE] HEREBY EXPRESSLY AND IRREVOCABLY WAIVES ITS SOVEREIGN IMMUNITY (AND ANY DEFENSE BASED THEREON) FROM ANY SUIT, ACTION, OR PROCEEDING (INCLUDING AN ARBITRATION PROCEEDING) OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OF NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION, EXECUTION, EXERCISE OF CONTEMPT POWERS, OR OTHERWISE) IN ANY FORUM, WITH RESPECT TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY....

(B) THE [TRIBE] HEREBY EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE COURTS OF THE STATE OF OKLAHOMA....

....

(D) IN THE EVENT A SUIT IS COMMENCED ON THIS AGREEMENT ... (INCLUDING FOR THE ENFORCEMENT OF AN ARBITRATION AWARD), THE [TRIBE] COVENANTS THAT IT WILL NOT DISPUTE THE JURISDICTION OF THE COURTS OF THE STATE OF OKLAHOMA.... (emphasis in original).

¶ 7 After consummation of the loan transaction and transfer of the loan proceeds, the Tribe failed to make the interest payment due on the loan for August of 2010.[4] The Bank filed its request for arbitration on September 28, 2010, alleging the Tribe had breached the loan agreement. The parties selected an arbitrator and on May 23, 2011, after five days of trial, the arbitrator entered an award in favor of the Bank in the amount of $2,751,160.20 (Arbitration Award). The Bank filed this action in the district court on May 24, 2011. The district court confirmed the arbitration award and entered judgment in favor of the Bank on November 15, 2011.

¶ 8 On March 19, 2012, the Bank obtained a temporary restraining order prohibiting the transfer of casino funds, other than winnings, until further order of the district court, and the matter was set for hearing on the Bank's motion to require the Tribe to turn over casino funds in satisfaction of the Bank's Judgment. On March 27, 2012, the district court denied the Tribe's motion to vacate the March 19 order. On April 3, 2012, the district court granted the Bank's pending motion and ordered the Tribe to turn over $130,000 "from casinos' money" to counsel for the Bank.

¶ 9 Four orders have been appealed and are consolidated for review in this case:

1. November 15, 2011, Order and Judgment Confirming Arbitration Award, case number 110,194 (Judgment);

2. March 19, 2012, Order Granting Temporary Restraining Order (Injunction[5]) and March 27, 2012, Order Denying Apache Tribe of Oklahoma's Motion to Vacate March 19 Order Granting Temporary Restraining Order (March 27 Order), case number 110,548; and

3. April 3, 2012, Order Compelling the Turnover of Cash Held at the Silver Buffalo and Golden Eagle Casinos (Turnover Order), case number 110,648.

Oral argument was held in this Court with respect to the Tribe's appeal in case no. 110,194 on August 13, 2013.

### STANDARD OF REVIEW

 ¶ 10 In confirming the Bank's arbitration award, the district court determined, as did the arbitrator, that the parties agreed to arbitrate any dispute regarding the Loan Agreement. The district court's "first task" in ruling on that issue "is to determine whether the parties agreed to arbitrate that dispute." *Wilkinson v. Dean Witter Reynolds, Inc.,* 1997 OK 20, ¶ 9, 933 P.2d 878, 880,

---

4. A more detailed statement of the parties' transactions and the litigation history of this dispute is contained in the Arbitration Award.

5. Although titled as a temporary restraining order, for the reasons stated in Part IV(C) of this Opinion, the March 19 Order is an injunction entered pursuant to 12 O.S.2011 842(A), not a temporary restraining order.

citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985). That determination is generally governed by principles of state contract law. *First Options of Chicago Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995); *Rogers v. Dell Computer Corporation,* 2005 OK 51, ¶ 14, 138 P.3d 826, 830. We review the district court's legal decisions regarding the existence of an agreement to arbitrate *de novo* and accept its findings of fact that are not clearly erroneous. *Kaplan,* 514 U.S. at 947–49, 115 S.Ct. at 1923.

¶ 11 However, to the extent the parties have agreed to arbitrate their disputes, judicial review of the substance of the arbitration award is constrained. A court "will set [an arbitrator's] decision aside only in very unusual circumstances." *Kaplan,* 514 U.S. at 942, 115 S.Ct. at 1923 (citing Title 9 U.S.C. 10 (2002)). As pertinent to the Tribe's appeal, the arbitration award may be vacated if "the arbitrators exceeded their powers." 9 U.S.C. 10(a)(4) (2002).[6]

■ ¶ 12 The Tribe's appeal of the district court's post-Judgment orders raises only issues of law. "Questions of law are reviewed *de novo. De novo* review of a lower court's legal ruling is plenary, independent and non-deferential." *Lierly v. Tidewater Petroleum Corp.,* 2006 OK 47, ¶ 16, 139 P.3d 897, 903.

### ANALYSIS

¶ 13 The Tribe has limited its appeal of the Judgment confirming the Arbitration Award to two issues: 1. Did the Business Committee have authority to waive the Tribe's sovereign immunity and sign the Loan Agreement? 2. If so, did the assignment of Casino revenues to secure repayment of the loan convert the Loan Agreement into a void

6. We apply federal law in this instance for the reasons stated in Part III of this Opinion.

7. The Tribe argues that the Bank waived its right to rely on the Federal Arbitration Act by moving to confirm its arbitration award in Oklahoma district court pursuant to the Oklahoma Arbitration Act. The Tribe contends, therefore, that the Oklahoma Uniform Arbitration Act controls. The Loan Agreement does state that it "shall be governed by, construed and enforced in accordance with, the internal law of the State of

management agreement? With respect to the first issue, it is undisputed that the Loan Agreement contains an arbitration agreement, which covers the disputed issues in this case and that the Loan Agreement was signed by the Chairman of the Business Committee. However, the Tribe argues that the Chairman did not have authority to sign the Loan Agreement, at least to the extent that the document contained a waiver of sovereign immunity or an agreement to arbitrate any disputes with the Bank. Therefore, the determination of whether the parties agreed to arbitrate this dispute, arbitrability, depends on whether the Chairman had the authority to sign the Loan Agreement. The arbitrator found that the Chairman had the requisite authority and that the arbitration agreement was enforceable against the Tribe. However, we must first determine who, court or arbitrator, decides that issue by determining whether the parties agreed to submit the issue of arbitrability to arbitration. *Kaplan,* 514 U.S. at 942, 115 S.Ct. at 1923.

### I. Arbitrability of the Tribe's Jurisdictional Claim

■ ¶ 14 Ordinarily, and unless the parties have clearly agreed that the arbitrator is to decide that issue of arbitrability, the court will decide whether an agreement to arbitrate exists and, if so, whether the parties have agreed to any limitation on the issues they have agreed to arbitrate using standard principles of state contract construction law. *Kaplan,* 514 U.S. at 944, 115 S.Ct. at 1924. As previously described, paragraph 11.24 of the Loan Agreement contains an agreement to resolve any dispute regarding the Loan Agreement by binding arbitration in accordance with the Federal Arbitration Act.[7]

Oklahoma." However, the arbitration provision provides: "All Disputes submitted to arbitration shall be resolved in accordance with the Federal Arbitration Act ... notwithstanding any conflicting choice of law provision in any of the Loan Documents." After the *Nitro–Lift Technologies, L.L.C. v. Howard,* — U.S. —, 133 S.Ct. 500, 184 L.Ed.2d 328 (2012), decision, we find no difference in the scope of judicial review regardless of which arbitration act is applied and the parties were unable to point to any difference at

¶ 15 The Bank argues that the parties agreed that the arbitrator would decide the initial issue of arbitrability and that Oklahoma courts are, therefore, bound by the arbitrator's determination that the Tribe waived sovereign immunity and agreed to arbitrate this dispute: "The parties agreed the [arbitrator] would resolve both questions of jurisdiction and of the Loan Agreement's existence and validity." (Appellee's Answer Brief, p. 8). The Bank bases this argument on paragraph 11.24(b) of the Loan Agreement which provides, in part: "Arbitration proceedings shall be administered by the American Arbitration Association ("AAA") or such other administrator as the parties shall mutually agree upon in accordance with the AAA Commercial Arbitration Rules." The Bank notes that the Commercial Arbitration Rules of the AAA provide that the arbitrator has the power to "rule on his or her own jurisdiction." The Bank cites numerous cases from various jurisdictions holding that an arbitrator decides the question of arbitrability including jurisdiction if the arbitration contract incorporates the rules of the AAA. We find these cases distinguishable.

¶ 16 For example, in *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366 (Fed.Cir.2006), the arbitration agreement provided: "Any dispute ... shall be settled by arbitration in accordance with the arbitration rules of the American Arbitration Association." *Id.* at 1368. Noting that Article 15 of those rules authorized arbitrators to rule on their own jurisdiction, the *Qualcomm* court held that the parties had agreed to arbitrate the issue of arbitrability. In contrast, the arbitration provision in the Loan Agreement here does not incorporate the substantive rules of the AAA except with respect to the process of selecting an administrator other than the AAA should that be necessary. The relevant provision in the Loan Agreement merely provides that any arbitration proceeding will be "*administered* by the American Arbitration Association." We find a clear distinction between an agreement to use the AAA's staff

and procedures for the selection of arbitrators in the administration of an arbitration proceeding, for example, and an agreement regarding the scope of the arbitrator's authority and what substantive issues the arbitrator will be authorized to decide.

¶ 17 Further, if the Bank's construction of paragraph 11.24(b) is correct, the lengthy definition of the "Dispute" the parties agree to arbitrate contained in paragraph 11.24(a) of the Loan Agreement is essentially unnecessary because the AAA Commercial Rules provide that the arbitrator can decide any claim or counterclaim unless the opposing party objects to the arbitrability of that claim. More importantly, although the definition of "Dispute" in the Loan Agreement is broad, there is no express reference to the issue of the arbitrator's jurisdiction in the list of the matters the parties are agreeing to arbitrate. This omission is more striking in light of the long-standing and clear federal law on this issue. "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Kaplan*, 514 U.S. at 944, 115 S.Ct. at 1924. As the *Kaplan* Court observed, "[a] party often might not focus upon" who decides arbitrability. Consequently:

> courts might hesitate to interpret silence or ambiguity on the "who should decide arbitrability" point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.

*Id.* at 945, 115 S.Ct. at 1925. That principle is particularly relevant when one party to the

oral argument. *Cf., Rogers*, 2005 OK 51, ¶ 15, 138 P.3d 826, 830: "In Oklahoma state courts, the [Oklahoma Uniform Arbitration Act] determines how proceedings on an application to compel arbitration shall be conducted so long as

the OUAA does not frustrate the purposes underlying the [Federal Arbitration Act]." Therefore, as the parties agreed in the Loan Agreement, we will apply the Federal Arbitration Act and federal decisions interpreting that Act.

arbitration agreement is an Indian tribe. "[T]o relinquish its immunity, a tribe's waiver must be 'clear.'" *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 418, 121 S.Ct. 1589, 1594, 149 L.Ed.2d 623 (2001). We find that the determination of the arbitrability issue by reference to rules incorporated into but not expressly stated in the arbitration provision fails to waive with the "requisite clarity" the Apache Tribe's sovereign immunity. *Id.*

¶ 18 Consequently, we do not find the Bank's argument that the parties agreed the arbitrator would decide arbitrability to be persuasive. Therefore, the arbitrator's decision that the arbitration provision in the Loan Agreement constitutes a valid waiver of the Tribe's sovereign immunity exceeded the arbitrator's authority and is not binding on the parties or this Court. *See* 9 U.S.C. 10(a)(4) (2002) (judicial review of an arbitration award determines whether an arbitrator exceeded his power). This Court will determine whether the Business Committee of the Apache Tribe was authorized to, and, if so, did waive the Tribe's sovereign immunity and agree to arbitrate disputes concerning the loan transaction with the Bank.

## II. Waiver of Sovereign Immunity

 ¶ 19 The foundational law dispositive of the sovereign immunity issue is well settled.

> Indian tribes are "distinct, independent political communities, retaining their original natural rights" in matters of local self-government. Although no longer "possessed of the full attributes of sovereignty," they remain a "separate people, with the power of regulating their internal and social relations."

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978) (internal citations omitted); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). "Indian tribes have long been recognized as possessing the common-law immuni-

ty from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. at 1677 (citing *Turner v. United States*, 248 U.S. 354, 358, 39 S.Ct. 109, 110, 63 L.Ed. 291 (1919)); *United States v. United States Fid. & Guar. Co.*, 309 U.S. 506, 512–13, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940); *Puyallup Tribe, Inc. v. Washington Dep't of Game*, 433 U.S. 165, 172–173, 97 S.Ct. 2616, 2620–21, 53 L.Ed.2d 667 (1977). "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Oklahoma v. Manufacturing Techs., Inc.*, 523 U.S. 751, 754, 118 S.Ct. 1700, 1702, 140 L.Ed.2d 981 (1998).[8] There is no Congressional authorization for the Bank's suit in this case. This case is determined by whether the Tribe voluntarily waived its sovereign immunity. That determination depends on whether the Business Committee had authority to sign the Loan Agreement because the Loan Agreement contains a clear and effective waiver of immunity. Determining the Business Committee's authority requires construction of the Apache Constitution and the two General Council Resolutions authorizing the Business Committee to conduct business on behalf of the Tribe.[9]

 ¶ 20 The first issue we must resolve, however, is what law to apply when construing those documents. We have found no controlling authority directly responsive to that issue. In "appropriate cases," common law rules of contract construction are applied to interpret agreements between Indian tribes and non-Indian entities. *C & L Enters.*, 532 U.S. at 423, 121 S.Ct. at 1596 (state arbitration act applies where the parties agreed to arbitrate disputes, their contract contained a choice-of-law clause providing state law governed the contract and authority to sign the contract was not an issue). However, we do not find it would be "appropriate" to apply Oklahoma law in the interpretation of the Tribe's documents even considering the

---

8. *See Kiowa Tribe of Oklahoma,* 523 U.S. at 756–60, 118 S.Ct. at 1703–05, explaining the origins of the tribal sovereign immunity doctrine.

9. We note that the record in this case is more fully developed regarding the authority of the Business Committee than was the record in *First Bank and Trust v. Maynahonah*, 2013 OK CIV APP 101, 313 P.3d 1044.

choice-of-law provision in paragraph 11.19 of the Loan Agreement. The Tribe's agreement to application of Oklahoma law and its canons of construction in that provision is limited to "construction, interpretation" of the Loan Agreement. Further, we note that "standard principles of statutory construction do not have their usual force in cases involving Indian law." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985).

¶ 21 We also decline to apply state agency law to determine internal tribal matters including the authority of the Business Committee and its members when purporting to waive the Tribe's immunity, in the absence of the Tribe's or the Committee's agreement to do so. Accord *Stillaguamish Tribe of Indians v. Pilchuck Group II, L.L.C.,* No. C10–995RAJ, 2011 WL 4001088 (W.D.Wash. Sept. 2, 2011) (unpublished)(state law has no bearing on who has authority to waive tribe's immunity). But *cf., Rush Creek Solutions, Inc. v. Ute Mountain Ute Tribe,* 107 P.3d 402 (Colo.Ct.App.2004) (where tribal constitution was silent as to the method of waiving sovereign immunity and CFO was authorized to sign contracts, Indian tribe was bound by waiver in contract signed by CFO pursuant to state law principle of apparent authority). *Rush Creek,* in our view, impermissibly finds a waiver (1) through application of state law to internal tribal matters without showing the tribe agreed state law would apply, and (2) as a result of conduct imputed to the tribe without showing the tribe authorized, consented to, adopted or ratified that conduct. As a result, the *Rush Creek* Court posits tribal immunity as a matter of state law in conflict with United States Supreme Court authority. "[T]ribal immunity is a matter of federal law and is not subject to diminution by the States." *Kiowa Tribe of Oklahoma,* 523 U.S. at 756, 118 S.Ct. at 1703. *Rush Creek* is also distinguishable with respect to the procedure for waiver of tribal immunity. The Colorado appellate court found the tribe's Constitution was silent as to the manner in which immunity could be waived. Here, that is not an issue. The General Council's constitutional authority to waive the Tribe's immunity from

suit or delegate that power to the Business Committee is not an issue in this case as discussed *post.* In this jurisdiction, the rule is settled: if an Indian tribe has specified the manner in which its immunity can be waived, "tribal law controls the way sovereign immunity can be waived by the Tribe." *Dilliner v. Seneca–Cayuga Tribe,* 2011 OK 61, ¶ 18, 258 P.3d 516, 520. This rule requires an affirmative act compliant with tribal law and procedure that clearly justifies the constitutional exercise of state court jurisdiction. *C & L Enters.,* 532 U.S. at 418, 121 S.Ct. at 1594.

¶ 22 Therefore, in the absence of an agreement to apply Oklahoma law, we conclude that interpretation of the Apache Constitution, the 1973 and 1978 Resolutions and the determination of whether the General Council delegated authority to the Business Committee to waive sovereign immunity is a matter of Apache Tribal law. "Courts have looked to tribal law in determining jurisdiction." *Dilliner,* 2011 OK 61, ¶ 13, 258 P.3d at 519. We also reach this conclusion "in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development." *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 216, 107 S.Ct. 1083, 1092, 94 L.Ed.2d 244 (1987). Finally, we recognize that the "sovereignty retained by tribes includes 'the power of regulating their internal and social relations,'" including "the power to make their own substantive law in internal matters." *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 332, 103 S.Ct. 2378, 2385, 76 L.Ed.2d 611 (1983).

¶ 23 Nonetheless, we have not been provided any Apache statutes, ordinances or case law that could be used to derive rules of construction applicable to the Tribe's documents in order to determine whether the Business Committee was delegated authority to waive the Tribe's immunity from suit in this case. In its Petition for Rehearing, the Tribe argues the appropriate rules of construction are stated in *MM&A Productions, LLC v. Yavapai–Apache Nation,* 234 Ariz.

60, 316 P.3d 1248, 1251–52 (Ariz.Ct.App. 2014):

> … waivers of sovereign immunity are strictly construed in favor of the sovereign. *Ramey Constr. Co. v. Apache Tribe of Mescalero Reservation,* 673 F.2d 315, 320 (10th Cir.1982). The United States Supreme Court has articulated repeatedly that a waiver of sovereign immunity " 'cannot be implied but must be unequivocally expressed.' " *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), quoting *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). In other words, the waiver must "expressly indicate[ ] the [tribe]'s consent" to suit. *Pan Am. Co.,* 884 F.2d at 418.

We are not persuaded. First, *Ramey Construction* involved a suit by a contractor against a tribe for the balance due on a construction contract. The contractor argued Congress had waived the tribe's immunity in and the court had jurisdiction pursuant to the Indian Civil Rights Act, 25 U.S.C. 1301 to 1341, because the tribe's refusal to pay the balance was a denial of equal protection, due process and access to the courts. As the *Ramey Construction* Court correctly noted, *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) resolved the contractor's claim: "suits against the tribe under the ICRA are barred by its sovereign immunity from suit." *Id.,* 436 U.S. at 59, 98 S.Ct. at 1677. *Ramey Construction* and *Santa Clara Pueblo* dealt with Congressional waivers of sovereign immunity, an issue distinct from the tribal waiver at issue in this case. Like the United States Court of Appeals for the Seventh Circuit, we "doubt whether there really is a requirement that a tribe's waiver of its sovereign immunity be explicit, especially since the harder it is for the tribe to waive its sovereign immunity the harder it is for it to make advantageous business transactions." *Sokaogon Gaming Enterprise Corp. v. Tushie–Montgomery Associates, Inc.,* 86 F.3d 656 (7th Cir.1996) (emphasis added)(agreement to arbitrate disputes constituted a clear waiver of tribal sovereign immunity). The Tribe has failed to demonstrate the applicability of the *Santa Clara Pueblo* rule applied in *Ramey Construction* for Congressional waivers to the tribal waiver at issue in this case.

■ ¶ 24 Second, the viability of *Pan American Co. v. Sycuan Band of Mission Indians,* 884 F.2d 416 (9th Cir.1989), the third case relied on by the *MM&A* Court is, at best, questionable. That case concerned whether a tribe waived immunity from suit by agreeing to an arbitration clause. The *Pan Am* Court reasoned: "*Santa Clara Pueblo* commands that waiver may only be found if the clause unequivocally and expressly indicates the Band's consent to waive its sovereign immunity." *Pan American,* 884 F.2d at 418. As previously discussed, *Santa Clara Pueblo* established the rule for determining when Congress has waived a tribe's immunity from suit. Where voluntary waiver by an Indian tribe is the issue, the applicable rule is stated in *C & L Enterprises:* "[T]o relinquish its immunity, a tribe's waiver must be 'clear,' " contrasting the "similar" but apparently not identical "unequivocally expressed" rule required by *Santa Clara Pueblo* for Congressional waivers. *C & L Enters.,* 532 U.S. at 418, 121 S.Ct. at 1594.[10] And, unlike the *Pan Am* Court, the *C & L Enterprises* Court found the tribe waived its immunity from suit with the "requisite clarity" when it signed a contract that included an agreement to arbitrate disputes. *Id.* Not only was *C & L Enterprises* decided

---

10. Like *Kiowa,* this case arises out of the breach of a commercial, off-reservation contract by a federally recognized Indian Tribe. The petitioning contractor, C & L, does not contend that Congress has abrogated tribal immunity in this setting. The question presented is whether the Tribe has waived its immunity.

To abrogate tribal immunity, Congress must "unequivocally" express that purpose. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (citing *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)). Similarly, to relinquish its immunity, a tribe's waiver must be "clear." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.,* 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). We are satisfied that the Tribe in this case has waived, with the requisite clarity, immunity from the suit C & L brought to enforce its arbitration award.

*C & L Enters.,* 532 U.S. at 418, 121 S.Ct. at 1594.

twelve years after *Pan Am*, but also the *C & L Enterprises* Court granted certiorari in that case to specifically resolve the conflict between the Ninth Circuit view as stated in *Pan Am* and the view of "several state and federal courts." *Id.*, 532 U.S. at 417–418, 121 S.Ct. at 1594. In our view, the holding in *Pan Am* has been abrogated. Therefore, we find no basis for the *MM&A* Court's conclusion that to be effective, a waiver of sovereign immunity must unequivocally express a tribe's consent to suit. However, we need not decide whether there is any real distinction between the *Santa Clara Pueblo* "unequivocally expressed" rule and the *C & L Enterprises* "clear waiver" rule.[11] "No case has ever held" that an Indian tribe must use the words "sovereign immunity" to effect an explicit waiver of that immunity. *C & L Enters.*, 532 U.S. at 420, 121 S.Ct. at 1595, citing this "cogent observation" in *Sokaogon*, 86 F.3d at 660, with approval.

■ ¶ 25 Third, we agree with the *MM&A* Court that there is a difference between delegation of tribal authority to waive sovereign immunity and the actual waiver of that immunity. The standard applicable in each circumstance is the precise issue we must resolve in this case. We do not agree, however, with the *MM&A* Court's resolution of that issue:

Express authorization and express language are two distinct but related issues, and requiring an express delegation of a tribe's authority to waive its immunity is a logical and consistent application of the overarching principle encompassing both issues: that the tribe itself must expressly consent to a waiver of its immunity. See *Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. 1670; *Pan Am. Co.*, 884 F.2d at 418. To hold otherwise would result in waivers that could not be traced to any explicit action by a tribe.

*MM&A*, 316 P.3d at 1253. For the reasons previously stated, *Santa Clara Pueblo* does not require this result. And, we decline to adopt the view urged by the Tribe: "the General Council must expressly state in the authorizing resolutions that the Business Committee has the authority to waive the Tribe's sovereign immunity." Although *C & L Enterprises* and similar cases have established the law with respect to determining when a tribe has waived its immunity from suit, only by implication do those cases address the law applicable for determining whether one tribal entity has delegated authority to waive the tribe's immunity to another tribal entity.[12] In our view, *C & L Enterprises* sets the outer limits of the "delegation law" and stands for the proposition that if state court jurisdiction can be predicated on a "clear waiver" of tribal immunity, no more is required to determine that the entity executing that waiver was delegated the authority to do so. And, just as no case has held that the words "sovereign immunity" must be used by a tribe to effectuate a waiver of immunity, no controlling authority has required the use of specific language before one tribal entity can effectively delegate authority to waive sovereign immunity to another tribal entity.

■ ¶ 26 That conclusion still leaves us to determine what law to apply when deciding whether a purported delegation of authority to waive immunity has been sufficiently "clear." Although not controlling, we find some guidance on this point in federal law regarding the interpretation of treaties between Indian tribes and the federal government. "[W]e interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196, 119 S.Ct. 1187,

11. To the extent there is a difference, the more restrictive *Santa Clara Pueblo* rule could be interpreted to foreclose waivers based on conduct intended by a tribe to waive its immunity from suit or, if not specifically intended, waiver of immunity would be the unavoidable consequence of that conduct. Litigation conduct, for example, including voluntarily invoking state or federal court jurisdiction in lieu of tribal court alternatives, might require waiver of tribal immunity

even in the absence of an unequivocal expression to do so.

12. *C & L Enterprises* declined to specifically address the tribe's belated argument that the tribal officials who signed the contract containing the waiver of immunity did not have authority to do so. *C & L Enters.*, 532 U.S. at 423, n. 6, 121 S.Ct. at 1597, n. 6.

1201, 143 L.Ed.2d 270 (1999). "[T]his Court has often held that treaties with the Indians must be interpreted as they would have understood them." *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970). In addition, the United States Supreme Court has determined that a "natural reading" of the treaty language can aid in the interpretation of the document. *Id.* at 634, 90 S.Ct. at 1336. Consequently, we will interpret the Tribe's Constitution and Resolutions as the Tribe appears to have understood those documents.[13]

¶ 27 The Constitution of the Apache Tribe of Oklahoma was first adopted on February 5, 1972, and the applicable document was last amended on June 20, 1987. Article III of the Tribe's Constitution states that the "supreme governing body of the Apache Tribe of Oklahoma shall be the [General] Council." Although no specific provision of the Apache Constitution authorizes it to do so, it is clear that the General Council has authority to waive the Tribe's immunity from suit. See e.g., *Kiowa Tribe of Oklahoma*, 523 U.S. at 760, 118 S.Ct. at 1705 (inherent in a sovereign's immunity from suit is the power to waive that immunity). Further, the record in this case establishes that the Tribe has, on occasion, exercised its power to waive that immunity. The Apache Tribe conducts gaming operations in Oklahoma. To do so, the Tribe was required to enter into a Tribal Gaming Compact with the State of Oklahoma. 3A O.S.2011 262. The form of that contract is specified by statute and required the Tribe to waive sovereign immunity, subject to certain limitations, with respect to tort claims and prize claims against the Tribe and also required the Tribe to agree to waive sovereign immunity and arbitrate any disputes with the State of Oklahoma concerning the Compact. 3A O.S.2011 281; *Sheffer v. Buffalo Run Casino, PTE, Inc.*, 2013 OK 77, 315 P.3d 359. Not only does the General Council have authority to waive the Tribe's immunity but also it may delegate that authority to another tribal entity even in the absence of any specific Constitutional provision to do so. "[T]he General Council may, by appropriate resolutions, delegate to the Business Committee the authority to waive sovereign immunity on behalf of the Tribe." (Tribe's Petition for Rehearing, p. 1). As stated, the fundamental issue in this case is whether the General Council delegated authority to waive the Tribe's sovereign immunity to the Apache Business Committee.

¶ 28 Article V of the Apache Constitution authorizes the establishment of a business committee and provides:

> This committee shall have such powers as may be delegated to it by appropriate resolution of the General Council, and, within such delegated authority, may transact business and otherwise speak or act on behalf of the tribe in all matters on which the tribe is empowered to act now or in the future.

Pursuant to this constitutional authority, the General Council established the Apache Tribal Business Committee and adopted two Resolutions defining the authority of that Committee. On August 26, 1972, the General Council passed Resolution 73–1 by a vote of 52 to 0, providing:

> WHEREAS, It has now come to the attention of the tribe to delegate more authority to the Apache Tribal Business Committee. NOW THEREFORE BE IT RESOLVED: That the tribe does hereby go

---

**13.** In its Petition for Rehearing, the Tribe criticizes this approach and argues for a strict construction against waiver and a resolution of all ambiguities in favor of the Tribe without regard to the Tribe's understanding of its internal documents. Pushed to its logical conclusion, this argument would result in a construction that produced a litigation victory avoiding commercial liability although every tribal member and tribal official believed the tribe had waived its immunity from suit for the transaction. We have found only two cases that seem to acknowledge this approach, *Kiowa Tribe of Oklahoma, Inc.*, 523 U.S. at 758, 118 S.Ct. at 1704 ("At one time, the doctrine of tribal immunity from suit might have been thought necessary to protect nascent tribal governments from encroachments by States"), and *Sokaogon*, 86 F.3d at 659 ("the only purpose that a requirement of a clear statement could serve would be the admittedly, perhaps archaically, paternalistic purpose of protecting the tribe against being tricked by a contractor into surrendering a valuable right for insufficient consideration.") We have found no case in which a court has engaged in a particular construction to protect the tribe from "itself." *MM&A*, 316 P.3d at 1253.

on record to delegate its full and complete authority to the Business Committee to transact any and all business related to the tribe involving matters such as tribal land, tribal budget and any other matters relating to government programs and the Bureau of Indian Affairs....

On September 10, 1977, the General Council passed Resolution 78–7 by a vote of 32 to 0. That resolution provides:

> WHEREAS, The General Council of the Apache Tribe recognizes the need for the Business Committee to have some authority, and needs this authority without the necessity of calling a General Council to act on business for the tribe. According to Article V of the Apache Constitution of the Apache Tribe of Oklahoma and,

> WHEREAS, the Apache Tribe of Oklahoma does hereby go on record similar to Resolution 73–1 to delegate authority to transact business related to the Apache Tribe of Oklahoma

> NOW THEREFORE BE IT RESOLVED that this foregoing Resolution will go on record for the Business Committee.

These three provisions constitute the documentation of the Business Committee's delegated authority in this record. Pursuant to this authority, the Business Committee adopted Resolution 06–23–08 by a vote of three to zero on June 23, 2008.[14] That Resolution approved the loan transaction with the Bank, adopted the form of the Loan Agreement containing the waiver of Tribal sovereign immunity, consent to jurisdiction in Oklahoma state and federal courts and arbitration provision contained therein. The 2008 Resolution also authorized the Chairman of the Business Committee to execute the Loan Agreement. The Chairman signed the Loan Agreement with the Bank the same day.

¶ 29 The Tribe raises essentially two arguments in support of its contention that the Business Committee did not have authority to waive Tribal sovereign immunity. First, the Tribe relies on the obvious absence of any specific reference to "sovereign immunity" in either Resolution 73–1 or Resolution 78–7. The Tribe contends that authority to "transact business" does not include authority to waive sovereign immunity. Therefore, the Tribe concludes, absent specific authorization to waive sovereign immunity by the General Council, the Tribe cannot be sued in Oklahoma state courts. As previously discussed, "[n]o case has ever held" that an Indian tribe must use the words "sovereign immunity" to effect an explicit waiver of that immunity. *C & L Enters.*, 532 U.S. at 420–21, 121 S.Ct. at 1595. We will not be the first.

¶ 30 Second, the Tribe's argument misses the point. The question is not whether the General Council signed some document agreeing the Business Committee could waive sovereign immunity in conjunction with the Bank's loan. The question is whether the General Council authorized the Business Committee to waive the Tribe's sovereign immunity when necessary to "transact business." As previously discussed, the Apache Constitution authorizes the General Council to establish a business committee to "transact business and otherwise speak or act on behalf of the tribe in all matters on which the tribe is empowered to act now or in the future." We have previously established that one such "matter" is the General Council's authority to delegate the power to waive sovereign immunity to the Business Committee. The General Council may also define the limits of the business committee's author-

---

**14.** The record contains what appear to be minutes of the annual meeting of the General Council held on June 21, 2008, and purporting to recall and remove the Chairman and Vice–Chairman of the Business Committee, two of the signatories to this Resolution. However, the record also contains letters from the Department of the Interior dated as late as October 22, 2008, recognizing the Chairman and Vice–Chairman as members of the Business Committee elected at a May 10, 2008, election. Article VII, Section 2 of the Apache Constitution provides that members of the Business Committee "shall serve until their successors are elected and certified." There is no evidence in this record of any election between the May 10, 2008, election and the June 23, 2008, execution of the Loan Agreement, and the Tribe does not contend that the Chairman and Vice–Chairman were not members of the Business Committee on June 23, 2008 or that they were not authorized to act on behalf of the Committee on that date.

ity by "appropriate resolution." In this case, the General Council did so through Resolution 73–1 and Resolution 78–7.[15] Therefore, interpretation of these resolutions determines whether the General Council delegated authority to the Business Committee to waive the Tribe's sovereign immunity.

¶ 31 The Tribe argues that the language of Resolution 73–1 delegating the Tribe's "full and complete authority to the Business Committee to transact any and all business" is limited to matters involving only "tribal land, tribal budget and any other matters relating to government programs and the Bureau of Indian Affairs." Because the Apache Constitution only authorizes the Business Committee to operate "within [its] delegated authority," the Tribe concludes that this grant of authority does not extend to matters outside those areas, including authority to borrow money to finance casino operations. We are willing to assume that Resolution 73–1 is as limited as the Tribe contends. It must follow, however, from a "natural reading" of Resolution 78–7 that the second resolution expanded the Business Committee's original limited authority. Resolution 78–7 contains a delegation of authority to transact business "similar to Resolution 73–1" but omits the restriction to tribal lands, tribal budgets and matters relating to government programs and the Bureau of Indian Affairs: "the Apache Tribe of Oklahoma does hereby go on record similar to Resolution 73–1 to delegate authority to transact business related to the Apache Tribe of Oklahoma." The only

qualification in Resolution 78–7 is that the business must be "related" to the Tribe. Because the subject matter of the two resolutions is clearly related and Resolution 78–7 specifically refers to Resolution 73–1, we find it reasonable to construe them together. And, from the language of Resolution 78–7, this is how members of the Tribe appear to have understood the relationship of the two resolutions. From the plain language of these two Resolutions, we conclude that the General Council delegated "its full and complete authority to the Business Committee to transact any and all business" on behalf of the Tribe including authority to waive the Tribe's sovereign immunity.[16]

¶ 32 *Dilliner*, analyzing an apparently identical constitutional provision, reached the same result. In that case, the tribal constitution also contained a provision granting the business committee "the power to transact business and to speak or act on behalf of the Tribe in all matters in which the Tribe is empowered to act." *Dilliner*, 2011 OK 61, ¶ 2, 258 P.3d at 517. Based on that authority, the Supreme Court held that the business committee had authority to waive the tribe's sovereign immunity. *Dilliner*, however, is distinguishable in one respect. In that case, the business committee adopted by-law and resolution provisions prohibiting any single member of the committee from acting on behalf of the committee and requiring the committee's consent by resolution to any waiver of sovereign immunity. The committee authorized the tribe's chief to sign em-

---

**15.** We recognize that these Resolutions and the general authority to transact business granted therein have been interpreted as not authorizing the Business Committee to cede Tribal jurisdiction to the Court of Indian Offenses with respect to internal tribal government disputes. *See Apache Election Board, et al. v. Alonzo Chaleph, et al. and the Honorable Phil Lujan*, CIV–06–A05P filed November 16, 2007, in the Court of Indian Appeals for the Apache Tribe of Oklahoma. We also find nothing in Resolutions 73–1 or 78–7 granting the Business Committee any authority over internal tribal government disputes. However, the Tribe's transactions with the Bank did not, at least initially, involve internal tribal government disputes.

**16.** The "plain language" construction of these documents is consistent with the manner of interpretation utilized by the United States Department of Interior to interpret the Tribe's Consti-

tution and was adopted by the United States District Court for the Western District of Oklahoma in *Carattini v. Salazar*, 2010 WL 4568876, (W.D.Okla. November 3, 2010). Further, we are not persuaded by the Tribe's argument that there is a difference between authority to "transact business" and authority to "speak or act on behalf of the tribe in all matters on which the tribe is empowered to act now or in the future." These two phrases are joined by the conjunctive coordinate conjunction, "and." "Conjunctive conjunctions bring elements together. They have an additive function." Michael Strumpf and Auriel Douglas, *The Grammar Bible* 239 (Henry Holt and Company, 3rd ed.2004). Consequently, within its delegated authority the Business Committee may transact business *and* speak or act on behalf of the Tribe unless specifically provided otherwise.

ployment contracts but because the committee did not also consent to a waiver of the tribe's immunity, the waiver provisions in those contracts were not effective and the tribe was immune from suit by the employees. Here, the Business Committee has not adopted any similar provision nor is there anything in the record limiting the Business Committee's authority to waive the Tribe's sovereign immunity or specifying the procedure by which that waiver must be accomplished.

¶ 33 This conclusion is supported by the evidence in the record reflecting how the Tribe understood the authority delegated to the Business Committee pursuant to these two Resolutions. As previously discussed, and as the language of the Tribe's Constitution confirms, part of the Tribe's "full and complete authority" is the authority to waive sovereign immunity as well as the authority to delegate the authority to waive sovereign immunity to the Apache Business Committee. We are convinced from a review of the relevant documents in this record that Tribal officials and members of the Apache Tribe understood Resolutions 73–1 and 78–7 as delegating authority to the Business Committee to waive the Tribe's sovereign immunity when necessary to "transact business." [17]

¶ 34 First, the members of the Business Committee who are also members of the Tribe certainly understood that they had the authority to waive the Tribe's sovereign immunity. *Cf., Native Am. Distrib. v. Seneca–Cayuga Tobacco Co.,* 546 F.3d 1288, 1293 (10th Cir.2008), relying on belief of tribal business committee in establishing tribal entity to determine waiver of sovereign immu-

nity. Resolution 06–23–08 notes that the Business Committee is vested with authority to negotiate and contract with private entities pursuant to Resolutions 73–1 and 78–7, and goes on to specifically approve the waiver of sovereign immunity expressed in the Loan Agreement. That Resolution is signed by the Chairman and Vice–Chairman. The Chairman and Vice–Chairman of the Business Committee are, pursuant to Articles IV and V of the Apache Constitution, also the Chairman and Vice–Chairman of the Apache Tribe. In addition, a Borrower's Opinion was issued on June 23, 2008, by the Tribe's legal counsel in conjunction with, and as a condition to, the Bank's loan. That document states, in part, that the Business Committee has the "full power to bind" the Tribe with respect to the Loan Agreement and has authorized the Chairman of the Business Committee to execute the Loan Agreement; that with respect to the Loan Agreement transaction, the Tribe has waived its sovereign immunity, consented to binding arbitration and to the jurisdiction of the courts of the State of Oklahoma, and that "all necessary tribal action required under the tribal law ... has been taken by the [Tribe] with respect to the foregoing." Finally, a letter also dated June 23, 2008, from legal counsel for the Apache Gaming Commission states that the Business Committee is "authorized to transact business and exercise its powers as an Indian tribe and has approved" the Loan Agreement and that other than Business Committee Resolution 06–23–08, which was "duly approved and obtained," no Tribal approval, consent or authorization was necessary to effectuate the transaction contemplated by the Loan Agreement.[18]

*Native American Distributing v. Seneca–Cayuga Tobacco Co.,* 546 F.3d 1288 (10th Cir.2008) for the proposition that a tribal official's mistaken belief regarding the scope of authority is not binding on the tribe. We recognize that "[i]t is a corollary to immunity from suit ... that this immunity cannot be waived by officials." *United States v. United States Fidelity & Guaranty Co. et al.,* 309 U.S. 506, 513, 60 S.Ct. 653, 657, 84 L.Ed. 894 (1940). However, these two documents are not cited as acts constituting an unauthorized waiver of immunity by tribal officials but as evidence that the two lawyers representing the Tribe's entities in this specific transaction held the legal opinion that the Business Committee was authorized by the Tribe to sign the Loan

---

**17.** The Tribe correctly notes that prior to execution of the Loan Agreement, a lawyer representing the Bank in this transaction expressed concern that approval of the General Council would be necessary because of the "lack of specificity" in Resolutions 73–1 and 78–7 regarding the Business Committee's authority to waive the Tribe's sovereign immunity. Although this opinion may reflect how the Bank understood these two resolutions, it does not provide any assistance in determining how members of the Tribe understood these Resolutions.

**18.** The Tribe argues that these opinions are irrelevant citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947) and

¶ 35 Second, we note that the Arbitrator also found that pursuant to the authority granted in Resolutions 73–1 and 78–7, the Apache Business Committee "has repeatedly and routinely entered into contracts on behalf of the Tribe and waived the Tribe's sovereign immunity from suit." For the reasons stated in Part I of this Opinion, we have not relied on this finding in determining the jurisdiction of the Oklahoma courts. However, the record contains evidence of four transactions that support the Arbitrator's finding. In May of 2006, the Business Committee adopted a resolution approving agreements with Eagle Visions Gaming Group of Oklahoma, Inc., a Florida corporation, for the development, construction and financing of the Silver Buffalo Casino. A limited waiver of sovereign immunity was included in that resolution. In September of 2007, the Business Committee adopted a resolution selecting Icon Builders as the contractor for a sports bar at the Silver Buffalo Casino and authorizing the execution of a contract between the Tribe and Icon. That contract contained an arbitration agreement, consent to jurisdiction in federal court or "the state court of Caddo County" for the enforcement of any arbitration award and a limited waiver of sovereign immunity to the extent necessary to enforce "the arbitrator's decision." In November of 2007, the Business Committee adopted a resolution approving a loan to purchase property for the construction of a gaming facility. The resolution contained a waiver of sovereign immunity with respect to the loan transaction, agreement to arbitrate disputes, and a consent to be sued in federal court or, if jurisdiction was lacking, in the general jurisdiction courts of the State of Oklahoma to enforce any arbitration award or judgment confirming that award. In December of 2007, the Business Committee adopted a resolution approving a financial services agreement with KAGD, LLC. That resolution and the related document also contain a limited waiver of sovereign immunity. Each of the 2007 resolutions references Resolutions 73–1 and 78–7 as the authority for the Business Committee's action. The 2006 resolution states that the Business Committee is acting "pursuant to its delegated authorities under the Constitution of the Apache Tribe of Oklahoma."

¶ 36 Therefore, pursuant to Resolutions 73–1 and 78–7, we find that the General Council delegated "its full and complete authority to the Business Committee to transact any and all business" including the authority to waive the Tribe's sovereign immunity when necessary to transact that business. It is undisputed that the Loan Agreement contains an express waiver of the Tribe's sovereign immunity and consent to be sued in the courts of Oklahoma which fully satisfy all requirements of federal law. Consequently, the district court and this Court have jurisdiction over the Tribe in this case.

### III. Appellate Review of the Arbitration Award

¶ 37 The Tribe's second assignment of error regarding the confirmation of the arbitration award argues that the assignment of Casino revenues in the Loan Agreement converts that instrument into a management contract that must be approved by the National Indian Gaming Commission. Because there was no such approval, the Tribe argues the Loan Agreement violates the Indian Gaming Regulatory Act and is, therefore, void *ab initio* as is any purported waiver of sovereign immunity and consent to arbitration contained therein. This issue was litigated in the arbitration proceeding and the Arbitrator found that the "pledge of gross revenues does not make the Loan Agreement a management contract." The Arbitrator also concluded as a matter of law that the Loan Agreement was not void. The Arbitrator held, therefore, that the Bank was entitled to enforce the terms of the Loan Agreement which included the right to compel arbitration and enforce any arbitration award in Oklahoma or federal court.

¶ 38 The Tribe's argument concerns the validity of the Loan Agreement, not just the validity of the arbitration agreement. The Tribe argues that Oklahoma courts, not the Arbitrator, must decide that issue because it determines whether the Oklahoma courts

Agreement and waive the Tribe's immunity to the extent stated therein.

have jurisdiction. However, the authority supporting the Tribe's argument has now been abrogated. *See Nitro–Lift Techs., L.L.C. v. Howard,* —— U.S. ——, 133 S.Ct. 500, 184 L.Ed.2d 328 (2012). "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 445–46, 126 S.Ct. 1204, 1209, 163 L.Ed.2d 1038 (2006).

¶ 39 As discussed in Part I of this Opinion, our review of the Arbitrator's decision that the Loan Agreement is not a void management contract is limited by the Federal Arbitration Act:

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
>
> . . . .
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. 10 (2002).

> In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—
>
> . . . .
>
> (b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

9 U.S.C. 11 (1947). Sections 10 and 11 provide the "exclusive regimes" for judicial review of an arbitration award provided by the Federal Arbitration Act. *Hall Street Assocs., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 590, 128 S.Ct. 1396, 1406, 170 L.Ed.2d 254 (2008). Determining whether the Arbitrator exceeded his authority in deciding that the Loan Agreement was valid in this case is determined by whether the parties agreed to arbitrate the "management contract" issue. Paragraph 11.24(a) of the Loan Agreement

defining the matters the parties agreed to arbitrate includes "any action, dispute, claim or controversy of any kind . . . now existing or hereafter arising under or in connection with, or in any way pertaining to, any of the Loan Documents. . . ." Consequently, and unlike the issue of jurisdiction, the parties agreed to arbitrate whether the Loan Agreement was void because it was an unapproved management agreement. Because the arbitrator did not exceed his authority in deciding that issue, his decision will not be set aside. *Kaplan,* 514 U.S. at 942, 115 S.Ct. at 1923.

## IV. Post–Arbitration Orders

¶ 40 In addition to the Judgment confirming the Arbitration Award, the district court entered three orders which the Tribe has appealed: the March 19, 2012, Injunction, the March 27, 2012, Order and the April 3, 2012, Turnover Order. These orders were entered in aid of the Bank's efforts, begun in January of 2012, to collect its Judgment. For example, on January 10, 2012, the district court entered orders directed to four individuals including the manager of the Tribe's casinos to appear and answer as to the assets of the casinos. Those orders were entered pursuant to Oklahoma's enforcement of judgment statutes.

> At any time after a final judgment, order, or decree is filed, on application of the judgment creditor, a judge of the court in which the final judgment, order, or decree was rendered shall order the judgment debtor to appear before the judge . . . at a time and place specified in the order, to answer concerning the judgment debtor's property.

12 O.S.2011 842(A). During its collection efforts, the Bank learned that a certain amount of cash generated from casino operations was stored in casino vaults. On March 19, 2012, the Bank filed two motions, Plaintiff's Verified *Ex Parte* Petition for a Temporary Restraining Order (*Ex Parte* Motion), and Plaintiff's Motion for an Order Compelling the Turnover of Cash (Turnover Motion). The district court granted the Bank's *Ex Parte* Motion, entered the March 19 Injunc-

tion restraining the Tribe's use of casino funds.

¶ 41 On March 27, 2012, the Tribe filed its Motion to Vacate March 19 Order Granting Temporary Restraining Order. After a hearing in the district court held on March 27, the Tribe's motion to vacate was denied. On March 29, the Tribe filed its petition in error appealing the March 19 Injunction and the March 27 denial of its motion to vacate. The Bank's Turnover Motion was heard on April 3, 2012. At the conclusion of that hearing, the district court entered the Turnover Order. The Tribe filed its appeal of the Turnover Order on May 4, 2012.

¶ 42 The Tribe's objections to the three post-Judgment orders can be summarized as follows: (1) the district court did not have subject matter jurisdiction to enter the March 19 Injunction or the April 3 Turnover Order because the property affected is located on Tribal land, (2) the Tribe's March 29 appeal of the March 27 Order denying its motion to vacate deprived the district court of jurisdiction to enter the April 3 Turnover Order, (3) the March 19 Injunction violates Rules 5 and 13(B) of the district court, is void because it was entered without the statutorily required notice and fails to show the requisite irreparable harm, and (4) the March 19 Injunction and the April 3 Turnover Order are preempted by the Indian Gaming Regulatory Act.

## A. Subject Matter Jurisdiction

¶ 43 The March 19 Injunction temporarily prohibited the manager of the Tribe's casinos from using casino cash for any purpose other than to pay winnings to casino customers until the Bank's Turnover Motion could be heard. The Turnover Order directed the Tribe to deliver $130,000 to counsel for the Bank. The Tribe argues that the district court lacked subject matter jurisdiction to enter these orders because the casinos are located on Tribal land. The Tribe contends that there is a difference between consenting to the jurisdiction of a state court and that court's power to exercise jurisdiction over property located on Tribal land. The Tribe notes that when Oklahoma was admitted to the Union, the inhabitants of

the State disclaimed "all right and title in or to ... all lands lying within said limits owned or held by any Indian, tribe, or nation...." Oklahoma Enabling Act, 34 Stat. 267–278 § 3 (1906). This disclaimer is confirmed in Article I, § 3 of the Oklahoma Constitution: "The people inhabiting the State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation...."

¶ 44 The Tribe cites cases recognizing that state courts do not have "jurisdiction over Indian tribes and tribal members in Indian country ... in the absence of express authorization by treaty or by Congress" or waiver of sovereign immunity by the tribe. *Waltrip v. Osage Million Dollar Elm Casino*, 2012 OK 65, ¶ 19, n. 7, 290 P.3d 741, 747, n. 7. The Tribe concludes that even if it waived sovereign immunity, it did not consent to Oklahoma court jurisdiction over its property located on tribal land, citing *In re Prairie Island Dakota Sioux*, 21 F.3d 302, 305 (8th Cir.1994) ("[a] waiver of sovereign immunity cannot extend a court's subject matter jurisdiction.").

¶ 45 The Tribe's argument fails for two reasons. First, the Constitutional disclaimer to any right and title to land owned by the Tribe is not a disclaimer to any interest to the proceeds of gaming operations conducted on that land to the extent that revenue was generated from nonmembers of the Tribe. *Cf. Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (state may tax sales of cigarettes on tribal land to nontribal members).

¶ 46 Second, the Tribe's argument fails to account for the possibility, as occurred in this case, that an Indian tribe may voluntarily relinquish title to its property wherever that property might be located. The Bank's ability to collect its Judgment in this case does not depend on an agreement with the Tribe creating jurisdiction in Oklahoma courts that otherwise did not exist, as was the case in the *Prairie Island Dakota Sioux* case. The district courts of Oklahoma

have virtually unlimited subject matter jurisdiction. "The District Court shall have unlimited original jurisdiction of all justiciable matters, except as otherwise provided in this Article...." Okla. Const. art. VII, 7(a). That jurisdiction includes jurisdiction to enforce judgments rendered by the district court. "At any time after judgment, any property of the judgment debtor ... unless by law expressly excluded from being reached by creditors shall be subject to the payment of such judgment, by action, or as hereinafter provided." 12 O.S.2011 841. "The ultimate purpose of [Oklahoma's enforcement of judgment statutes, 12 O.S.2011 841 through 862] is to effect the application of a judgment debtor's property to a judgment." *Ramco Operating Co. v. Gassett*, 1995 OK 8, ¶ 12, 890 P.2d 941, 944. Consequently, the Tribe's waiver of sovereign immunity, choice of Oklahoma law and consent to enforcement of the arbitration award in the courts of Oklahoma did not create any subject matter jurisdiction the district court did not already have; it merely provided the Bank a judicial forum for the enforcement of its Judgment the Bank would not have had absent the Tribe's consent.

¶ 47 As noted by the United States Supreme Court in *C & L Enterprises*, 532 U.S. at 420, 121 S.Ct. at 1595, interpreting almost identical arbitration and choice of law provisions, the "regime to which the Tribe subscribed includes entry of judgment upon an arbitration award" in any court of competent jurisdiction including the district courts of Oklahoma. *Id.* As in *C & L Enterprises*, the Tribe agreed in paragraph 11.24(b) of the Loan Agreement that: "Judgment upon any award rendered in an arbitration may be entered in any court having jurisdiction...." But unlike the Potawatomi Tribe in *C & L Enterprises*, in this case the Tribe also specifically agreed that the district court was one of those courts:

THE [TRIBE] HEREBY EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE COURTS OF THE STATE OF OKLAHOMA.... and IN THE EVENT A SUIT IS COMMENCED ON THIS AGREEMENT ... (INCLUDING FOR THE ENFORCEMENT OF AN ARBITRATION AWARD), THE [TRIBE] COVENANTS THAT IT WILL NOT DISPUTE THE JURISDICTION OF THE COURTS OF THE STATE OF OKLAHOMA....

Paragraphs 11.27(B) and 11.27(D) (emphasis in original). We find the Tribe's argument that the district court did not have subject matter jurisdiction to enter the March 19 Injunction and April 3 Turnover Order unpersuasive.

### B. Appellate Jurisdiction

 ¶ 48 The Tribe also challenges the district court's jurisdiction to enter the April 3 Turnover Order contending its March 29 appeal of the March 19 Injunction and March 27 Order denying the Tribe's motion to vacate deprived the district court of jurisdiction because its petition in error vested exclusive jurisdiction of the case in the Supreme Court, citing 12 O.S.2011 990.1: "When a petition in error is timely filed, the Supreme Court shall have jurisdiction of the entire action that is the subject of the appeal." The Tribe's argument is too narrowly focused.

 ¶ 49 For example, the Judgment confirming the Bank's arbitration award was filed on November 15, 2011. The Tribe's petition in error appealing that Judgment was filed December 13, 2011. Following the Tribe's argument, the district court lost jurisdiction of the case at that point. However, the Tribe's argument ignores the fact that even after an appeal is filed, the district court retains jurisdiction for some purposes including jurisdiction to decide the Tribe's motion to vacate [19] and jurisdiction to "take

---

19. Although styled as a motion to vacate, we are required to treat the motion as the substance of the motion dictates. *Knell v. Burnes*, 1982 OK 35, ¶ 4, 645 P.2d 471, 473. The Tribe's motion asked the district court to reconsider its March 19 Injunction and, therefore, is properly treated as a motion for new trial filed pursuant to 12 O.S.2011 651 and 653. "A motion seeking re-

consideration, re-examination, rehearing or vacation of a [decision by the court], which is filed within 10 days of the day such decision was rendered, may be regarded as the functional equivalent of a new trial motion, no matter what its title." *Horizons, Inc. v. Keo Leasing Co.*, 1984 OK 24, ¶ 4, 681 P.2d 757, 759.

action with respect to any issue collateral to a pending appeal." *See* Supreme Court Rule 1.37(a)(3) and (7). One matter collateral to the Tribe's March 29 appeal was the Bank's effort to enforce its Judgment. *Grand River Dam Auth. v. Eaton*, 1990 OK 133, ¶ 13, 803 P.2d 705, 709 (during appeal, successful party may enforce a judgment by execution, and collect its award, unless the defeated party secures payment of the judgment by deposit of money or an undertaking). The Tribe did not seek to stay enforcement of the Bank's Judgment pursuant to 12 O.S.2011 990.4. Consequently, the Bank was free to pursue collection of its Judgment despite the Tribe's appeal. *Cf., Lawrence v. Cleveland County Home Loan Auth.*, 1981 OK 28, ¶¶ 4 & 6, 626 P.2d 314, 316 (appeal moot where appellant failed to stay the judgment appealed "by judicially approved stay process" and the transaction challenged on appeal had been completed).

### C. The Notice Argument

■ ¶ 50 As previously discussed, the district court issued an injunction on March 19, 2012, restraining the Tribe, its casinos and the casino manager from using casino cash for any purpose other than the payment of winnings to casino customers. The Tribe contends the injunction was issued pursuant to Title 12 O.S.2011 1384.1.[20] The Tribe argues the Injunction was issued without the required statutory notice and in violation of the Rules of the district court prohibiting *ex parte* communications with the assigned judge and notice to the opposing side prior to entry of a temporary restraining order. The Tribe also argues on appeal that the Bank's collection action is one for money only and, therefore, that the Bank failed to show the irreparable harm necessary for the issuance of an injunction, citing section 1384.1(B)(1). This latter argument was not presented in the Tribe's motion for new trial and will not be considered for the reasons previously stated in Part IV(B) of this Opinion.

■ ¶ 51 We find unpersuasive the Tribe's argument that the March 19 Injunction is void because it was issued without notice to the Tribe. Although styled as a temporary restraining order, the district court's March 19 Injunction is not a temporary restraining order. "The meaning and effect of an instrument filed in court depends on its contents and substance rather than on

---

20. Title 12 O.S.2011 1384.1:

A. No temporary injunction shall be issued without notice to the adverse party.

B. A temporary restraining order may be granted without written or oral notice to the adverse party or the attorney for the adverse party only if:

1. it clearly appears from specific facts shown by affidavit or by the verified petition that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or the attorney for the adverse party can be heard in opposition; or

2. the attorney for the applicant certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required; and the court determines that the efforts of the applicant to give notice, if any, were reasonable under the circumstances.

C. Every temporary restraining order granted without notice:

1. shall be endorsed with the date and hour of issuance;

2. shall be filed in the office of the court clerk and entered of record; and

3. shall define the injury and state why it is irreparable and why the order was granted without notice.

D. If a temporary restraining order is granted without notice, the motion for a temporary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character. When the motion comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a temporary injunction and, if the party does not do so, the court shall dissolve the temporary restraining order. On two (2) days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution, modification, or require the posting of an undertaking, and in that event the court shall proceed to hear and determine the motion as expeditiously as the ends of justice require.

E. This section shall not apply to temporary restraining orders in actions for a divorce, alimony without a divorce, separate maintenance, an annulment, custody, or similar matters, guardianship or juvenile proceedings, or to proceedings brought pursuant to special statutes that provide alternate procedures for the obtaining of temporary restraining orders or temporary injunctions.

the form or title given it by the author." *Whitehorse v. Johnson*, 2007 OK 11, ¶ 8, n. 13, 156 P.3d 41, 45, n. 13. As the Bank points out, a section 1384.1 temporary restraining order is a precursor to a section 1382 temporary injunction. A temporary injunction is one issued "during the litigation." 12 O.S. 2011 1382. The March 19 Injunction was issued after Judgment had been entered.

¶ 52 Further, the March 19 Injunction was entered pursuant to Title 12 O.S.2011 842(A):

> At any time after a final judgment, order, or decree is filed, on application of the judgment creditor, a judge of the court in which the final judgment, order, or decree was rendered shall order the judgment debtor to appear before the judge ... to answer concerning the judgment debtor's property. The judge may, by order, enjoin the judgment debtor from alienating, concealing, or encumbering any of the judgment debtor's nonexempt property pending the hearing and further order of the court....

Section 1384.1 does not apply to "proceedings brought pursuant to special statutes that provide alternate procedures for the obtaining of temporary restraining orders or temporary injunctions." 12 O.S.2011 1384.1(E). There is no prohibition in section 842(A) against the entry of an injunction preserving a judgment debtor's assets without prior notice to the party enjoined.

¶ 53 Finally, the district court issued the four January 2012 orders to appear and answer as to the Tribe's assets previously described. Those orders were issued pursuant to section 842(A) as well, and contained the same injunction prohibiting the alienation, concealment or encumbrance of casino assets contained in the March 19 Injunction, yet the Tribe did not object to or appeal those orders. As authorized by section 842(A), the district court's March 19 Injunction ordered

the Tribe not to use casino cash for any purpose other than the payment of winnings until the hearing on the Bank's Turnover Motion. That hearing was scheduled for the following day but, at the Tribe's request, was not held until April 3, 2012. The Tribe has failed to cite any legal authority supporting its argument that it was entitled to notice prior to the issuance of the March 19 Injunction.

### D. The Preemption Argument

¶ 54 Finally, the Tribe argues that the district court did not have jurisdiction to enter the March 19 Injunction and April 3 Turnover Order because the court's authority to do so has been preempted by the Indian Gaming Regulatory Act, 25 U.S.C. 2701 to 2721 (1988). The Tribe's preemption argument can be summarized as follows: (1) Pursuant to the IGRA, 25 U.S.C. 2701(5) (1988), the Tribe has the "exclusive right to regulate gaming activity" on Tribal land; (2) The IGRA was intended by Congress to completely preempt state law in this area; (3) The March 19 Injunction and April 3 Turnover Order interfere with the Tribe's regulation of its gaming activity. (4) The IGRA preempts the March 19 Injunction and April 3 Turnover Order.[21]

¶ 55 The federal preemption doctrine is derived from the Supremacy Clause of the United States Constitution. *Felder v. Casey*, 487 U.S. 131, 138, 108 S.Ct. 2302, 2307, 101 L.Ed.2d 123 (1988). When employed, the doctrine will restrain the enforcement of a state common law, statute or regulation. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 522, 112 S.Ct. 2608, 2620, 120 L.Ed.2d 407 (1992). Preemption is either expressed in federal legislation or implied from Congressional intent. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation*

---

**21.** This "traditional preemption" argument is distinct from the comparable doctrine from which the Tribe's sovereignty is derived. *Barona Band of Mission Indians v. Yee*, 528 F.3d 1184, 1188–89 (9th Cir.2008). The issue of preemption of state law by the doctrine of tribal sovereignty is addressed in Part II of this Opinion. Because we conclude that the Tribe intentionally and unequivocally waived its sovereign immunity when it signed the Loan Agreement, we are not re-

quired to undertake the balancing of interests analysis set forth in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) to determine whether Oklahoma's enforcement of judgment statutes are preempted by the doctrine of tribal sovereign immunity. *Cf., Sheffer v. Buffalo Run Casino, PTE, Inc.*, 2013 OK 77, 315 P.3d 359 (absent a waiver of sovereign immunity tribe not subject to state dram-shop law).

& *Dev. Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). There is no express preemption of state law in the language of the IGRA. Therefore, the Tribe's preemption argument depends on whether preemption can be implied from the IGRA. Implied preemption is of two types, field preemption or conflict/obstacle preemption. *Gade v. National Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 98, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992). The "ultimate purpose" in any preemption analysis is to determine whether state regulation is inconsistent with a federal law. *Id.* Consequently, the focus of the Tribe's argument is not just the March 19 Injunction or the April 3 Turnover Order but also the Oklahoma law pursuant to which the district court was authorized to issue those orders. As previously discussed, the March 19 and April 3 orders were issued pursuant to Oklahoma's enforcement of judgment statutes, 12 O.S.2011 841 through 862.

¶ 56 No United States Supreme Court decision has addressed the preemptive effect of the IGRA. That Court has, however, decided cases involving other federal statutes that provide the analytical framework for resolving the tribe's preemption argument. These cases teach that the language of the federal statute is critical to the analysis. *See Gade,* 505 U.S. at 98, 112 S.Ct. at 2383 (state licensing and training law that directly, substantially, and specifically regulates occupational safety and health is an occupational safety and health standard within the meaning of the Occupational Health and Safety Act and is preempted); *Cipollone,* 505 U.S. at 522, 112 S.Ct. at 2620 (Federal Cigarette Labeling and Advertising Act preempted state law failure to warn claims but not breach of warranty claims); *Bates v. Dow Agrosciences LLC.,* 544 U.S. 431, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (for state law to be preempted by the Federal Insecticide, Fungicide, and Rodenticide Act it must require "labeling or packaging" that is "in addition to or different from" the federal Act because that is the statutorily defined province of the FIFRA).

¶ 57 Although the IGRA has not been addressed by the United States Supreme Court, it has been the subject of decisions

from federal Circuit Courts of Appeal. The Tribe cites *Gaming Corporation of America v. Dorsey & Whitney,* 88 F.3d 536 (8th Cir. 1996), for the proposition that the IGRA was intended to "completely preempt state law" in the field of the "governance of Tribal gaming activities." *Id.* at 544 (state law claims against law firm representing tribe during its gaming license process were preempted). The Tribe also relies on *United Keetoowah Band of Cherokee Indians v. State of Oklahoma ex rel. Moss,* 927 F.2d 1170, 1181 (10th Cir.1991) (holding the IGRA bars federal courts from enjoining Indian bingo games through application of state criminal law because "Congress has clearly occupied the regulatory field on Indian gaming."). These decisions are thorough, well-reasoned and persuasive. We conclude, as did the Eighth and Tenth Circuit Courts of Appeal, that the IGRA preempts the field in the regulation of "gaming activity." 25 U.S.C. 2701(5) (1988).

¶ 58 However, field preemption does not bar all state laws. Even though state laws that have a "direct and substantial effect" on the federal scheme are preempted, state laws of general applicability are not normally preempted. *Gade,* 505 U.S. at 107, 112 S.Ct. at 2387. *See also, Gaming Corp. of America,* 88 F.3d at 550:

Those causes of action which would interfere with the [Tribe's] ability to govern gaming should fall within the scope of IGRA's preemption of state law. . . .

Potentially valid claims under state law are those which would not interfere with the nation's governance of gaming.

The March 19 Injunction and the Turnover order were issued pursuant to Oklahoma's enforcement of judgment statutes. Those statutes are generally applicable regardless of the subject matter of the litigation in which the judgment was entered. Consequently, for the Tribe to prevail it must demonstrate that those statutes regulate the Tribe's gaming activity.

¶ 59 We are aided in our determination of this issue by federal decisions involving the IGRA and other state laws of general application. *See Mashantucket Pequot Tribe v. Town of Ledyard,* 722 F.3d 457 (2nd Cir.

2013) (state personal property tax on slot machines owned by non-Indians but leased to Indian tribe not preempted by IGRA even though tribe agreed to reimburse non-Indian lessor for the tax); *Barona Band of Mission Indians v. Yee,* 528 F.3d 1184 (9th Cir.2008) (IGRA does not preempt state sales tax on construction materials purchased by non-Indians from non-Indians even though used to construct tribal gaming facility and tribe agreed to reimburse contractor for any state sales tax); *Casino Res. Corp. v. Harrah's Entm't, Inc.,* 243 F.3d 435 (8th Cir.2001) (IGRA does not preempt state common law breach of contract suit by non-Indian co-developer of tribal casino against other non-Indian co-developer that terminated negotiations with tribe); *Confederated Tribes of Siletz Indians of Oregon v. State of Oregon,* 143 F.3d 481 (9th Cir.1998) (preemption analysis unnecessary to determine impact on tribe's gaming activity of state investigative report because tribal/state gaming compact provided for the application of state law and pursuant to state open records law, investigative report was a public record).

■■■■ ¶ 60 In addition to these IGRA cases, we find particularly instructive the basis on which the Plurality in *Cipollone* found state law breach of warranty claims were not preempted by the cigarette labeling act.

A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty. Accordingly, the "requirement[s]" imposed by an express warranty claim are not "imposed under State law," but rather imposed by the warrantor.... While the general duty not to breach warranties arises under state law, the particular "requirement ... based on smoking and health ... with respect to the advertising or promotion [of] cigarettes" in an express warranty claim arises from the manufacturer's statements in its advertisements. In short, a common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a "require-

ment ... imposed under State law" within the meaning of 5(b) [of the cigarette labeling act].

*Cipollone,* 505 U.S at 525–26, 112 S.Ct. at 2622. The Court elaborated on this analysis in footnote twenty-four: "common understanding dictates that a contractual requirement, although only enforceable under state law, is not 'imposed' by the State, but rather is 'imposed' by the contracting party upon itself." *Id.,* 505 U.S. at 526, n. 24, 112 S.Ct. at 2622, n. 24. This view was later adopted by the Supreme Court: "a cause of action on an express warranty asks only that a manufacturer make good on the contractual commitment that it voluntarily undertook by placing that warranty on its product." *Bates,* 544 U.S. at 444, 125 S.Ct. at 1788. Here, we also deal with a contractual provision voluntarily undertaken by the Tribe to submit to the laws of the State of Oklahoma for the enforcement and collection of any judgment entered on an arbitration award. As the *Casino Resource* court correctly noted: "Not every contract that is merely peripherally associated with tribal gaming is subject to IGRA's constraints." *Casino Resource,* 243 F.3d at 439. The fact that the purpose of this contract was to obtain a loan to fund the Tribe's gaming operation does not change our conclusion. "Extending IGRA to preempt any commercial activity remotely related to Indian gaming-employment contracts, food service contracts, innkeeper codes-stretches the statute beyond its stated purpose." *Barona Band of Mission Indians,* 528 F.3d at 1193. Further, we find nothing inconsistent with Oklahoma's general enforcement of judgment statutes and the Federal Indian policy stated in the IGRA of promoting "tribal economic development, tribal self-sufficiency, and strong tribal government." 25 U.S.C. 2701(4) (1988).[22] In short, the transaction resulting in the Loan Agreement is simply not in the "field" regulated by the IGRA. Consequently, the Tribe's preemption argument fails.

---

**22.** The Tribe's argument leads to an unsustainable conclusion: tribal economic development can only be fostered by laws that allow a tribe to

borrow money for its economic enterprises without requiring the tribe to repay that debt.

## CONCLUSION

¶ 61 Pursuant to its constitutional authority, the General Council of the Apache Tribe of Oklahoma established a Business Committee and delegated to that Committee the Tribe's full and complete authority to transact business on behalf of the Tribe, including authority to waive the Tribe's sovereign immunity and consent to arbitration. The Business Committee was authorized to execute the Loan Agreement with Wells Fargo Bank. The Loan Agreement contains a clear and express limited waiver of the Tribe's sovereign immunity, a consent to arbitrate disputes and an agreement that any arbitration award can be reduced to judgment and enforced in the courts of Oklahoma. The Loan Agreement is enforceable against the Tribe. The Judgment of the district court confirming the arbitration award in favor of Wells Fargo Bank is affirmed except to the extent that the Judgment confirms the arbitrator's decision that the Loan Agreement contains a valid waiver of the Tribe's sovereign immunity. That portion of the Judgment is reversed. The district court's March 19, 2012 Order Granting Temporary Restraining Order, March 27, 2012 Order Denying Apache Tribe of Oklahoma's Motion to Vacate March 19 Order Granting Temporary Restraining Order, and April 3, 2012 Order Compelling the Turnover of Cash Held at the Silver Buffalo and Golden Eagle Casinos are affirmed, and this case is remanded for further proceedings.

¶ 62 **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.**

BARNES, V.C.J., and WISEMAN, J., concur.